## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**CARA LESLIE ALEXANDER**, *et al.*        )
                                           )
   **Plaintiffs,**                         )
                                           )
   **v.**                                  )     **Civil Action Nos.**
                                           )     **96-2123/97-1288 (RCL)**
**FEDERAL BUREAU OF**                       )
**INVESTIGATION**, *et al.*,                )
                                           )     <u>**CONSOLIDATED ACTIONS**</u>
   **Defendants.**                         )
_____)

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on plaintiffs' motions for orders to show cause or

other relief regarding discovery disputes as to electronic information requested from the White

House.

## <u>INTRODUCTION</u>

In the midst of a discovery dispute between the parties about the extent to which the

defendant Executive Office of the President ("EOP") should be required to perform electronic

searches of White House e-mails, plaintiffs initiated the present proceeding by filing their

Emergency Motion to Supplement Plaintiffs' Motion to Compel and Request for Evidentiary

Hearing ("Emergency Motion").  In that motion, plaintiffs charged that EOP and its counsel

submitted to this Court an "obviously false" declaration from Daniel A. Barry ("Barry") "as part

of their effort to stonewall and obstruct plaintiffs' narrowed request for e-mail."  (Emergency

Motion at 5.)  Plaintiffs claimed that Barry, a career employee and computer specialist in the

1

White House Office of Administration ("OA"), falsely declared that, since July 14, 1994, all White House e-mails were stored and archived in the White House Automated Records Management System ("ARMS").  Invoking the Court's "inherent authority and its duty to supervise the integrity of its processes," plaintiffs requested an evidentiary hearing "to ferret out the facts in this apparent obstruction of justice."  (*Id.* at 10.)  The Court granted plaintiffs' request for an evidentiary hearing "[b]ecause the facts are clearly in dispute and cannot be resolved without a hearing."  (Order of July 20, 2000, at 3.)

The Court heard testimony from numerous witnesses, ranging from working-level contractual employees, to Charles F.C. Ruff, late former Counsel to the President, to White House Chief of Staff John Podesta.  It has also reviewed thousands of pages of documents.

Although plaintiffs were given every opportunity to develop their case, if any, to the fullest extent, it is clear that neither EOP nor its counsel obstructed plaintiffs' request for e-mail or engaged in any other obstruction of justice, and neither EOP nor its counsel acted in bad faith to abuse the Court's processes.  In addition, there is no evidence that e-mails relevant to this case were lost and not retrieved and produced.  In short, plaintiffs have come up with no credible evidence to substantiate the charges they made when they filed their Emergency Motion.

The evidence shows the following: (1) on July 14, 1994, EOP put a system ("ARMS") into operation to store and archive electronic records, including e-mails; (2) after the introduction in 1996 of a new e-mail system called "Lotus Notes," a coding error was made for which a private contractor to EOP was responsible, that caused external e-mail to Lotus Notes accounts handled by a server named "Mail2" not to be received by or stored in ARMS; (3) the existence of what later became known as the "Mail2 problem" was discovered by employees of Northrup-

2

Grumman ("NG"), a successor EOP private contractor, in June 1998, and reported immediately to OA officials, to the White House Counsel, and to the Deputy White House Chief of Staff; (4) the Mail2 problem was fixed prospectively in November 1998, and a process was undertaken at the Court's request to restore e-mails affected by the Mail2 problem and make them searchable for this litigation; (5) OA officials, who had differing degrees of understanding of the technical problem, were neither responsible for nor had a basis to know to what extent the problem affected the integrity of EOP's responses to past or pending e-mail production demands by Congress or the Office of Independent Counsel, or EOP's position with respect to potential e-mail searches in the present case; (6) the White House Counsel's office, which did have the responsibility to ensure full compliance with information requests, did not understand the extent of the technical problem, and those few attorneys in that office who were aware of it erroneously believed that past searches had not been affected, so there was no problem; and therefore (7) neither OA nor the Counsel's office timely alerted Department of Justice ("DOJ") counsel in the present case to the Mail2 problem.

The Court has concluded that the essential errors made by the White House Counsel's Office were caused by a lack of familiarity with computer terminology and language and workings by the lawyers involved. Mr. Barry, the computer expert, simply talked a different language, and the lawyers he dealt with did not fully appreciate the significance of some of the information that he gave them, and the information he didn't give them. All of this occurred long before development of current sophisticated ways that lawyers have had to learn to deal with computer experts. It calls to the Court's mind its own experience in dealing with intelligence officials, i.e., if you don't use the right words in your question, you won't get the right answer.

You have to learn to ask the question in a number of ways, and probe and examine and get into

the nitty-gritty to understand what the truth is.  None of the White House lawyers involved in this

matter did that.  But plaintiffs produced no evidence whatsoever that any of those lawyers

deliberately obstructed justice, or deliberately provided what turned out to be false information to

the Court.  Not only is the evidence not "clear and convincing," as would be required for this

Court to rule for plaintiffs on their contempt motion, but there is simply no evidence of any

deliberate effort to conceal the truth.  Plaintiffs would have the Court infer that some grand

conspiracy existed to deprive them of necessary information.  Plaintiffs simply have no such

evidence.

## FACTUAL BACKGROUND

### 1.   ARMS

Following the resolution of the *Armstrong* litigation,[1] EOP undertook the task of storing

and archiving electronic records, including e-mails.  To accomplish this task, Barry, a computer

specialist in OA hired during the term of President George H.W. Bush, designed a records

management system called ARMS.  (Aug. 3 Tr. 33-34.)[2]  EOP put ARMS into operation on July

14, 1994.  (Aug. 31 Tr. 41.)

When ARMS became operational, it received and stored e-mails from an existing e-mail

system called the "All-in-One" e-mail system.  (Aug. 3 Tr. 35.)  Barry worked extensively with

---

[1] *See* 1 F.3d 1274 (D.C. Cir. 1993).  *Armstrong* dealt with, among other things, the question of whether e-mails are federal records within the meaning of the Federal Records Act.

[2] The designation "Aug. 3 Tr. 33-34" refers to the page numbers of the transcript of the testimony heard by the Court on August 3, 2000.  Similar designations in this memorandum will be used to refer to other transcripts from the series of hearings held in 2000, unless otherwise indicated.

this All-in-One system.  (*Id.* at 24-25.)  His responsibilities included reconstructing e-mail from

All-in-One backup tapes, on which pre-July 1994 e-mail was stored.  (Aug. 21 Tr. 39-40.)  When

a new e-mail system called "Lotus Notes" was added beginning in 1996, a computer software

program known as the Notes-ARMS interface was developed so that e-mails from Lotus Notes

also would be received by ARMS for storage.  (Aug. 3 Tr. 43.)[3]

Barry did not have responsibility for the Lotus Notes e-mail system or its interface

program with ARMS, although he continued to operate and maintain ARMS, and he searched

ARMS for documents at the request of the White House Counsel's office.  (*Id.* at 52.)  Instead,

PRC, Inc., a private contractor for EOP, operated and maintained Lotus Notes from its inception

until late 1997, when the operation and maintenance of Lotus Notes and its interface with ARMS

were taken over by Northrup-Grumman ("NG"), another private contractor.  (Aug. 1 Tr. 229;

Aug. 2 Tr. 14-15; Aug. 3 Tr. 43; Aug. 21 Tr. 30-31.)

## 2.      The January 1998 Anomaly and the First Barry Declaration

On January 12, 1998, plaintiffs served on the EOP a Notice of Deposition and Request

for Production of Documents pursuant to Federal Rule of Civil Procedure Rule 30(b)(5),(6)

("30(b)(6) Notice").  The 30(b)(6) Notice sought the designation of one or more representatives

to testify on a total of nine issues, two of which concerned the storage and retrieval of e-mail at

EOP.

Before EOP formally responded to the 30(b)(6) Notice, EOP's counsel, on January 13,

---

[3] Generally, the e-mails received by ARMS are those designated as "record" under either the Federal Records Act or the Presidential Records Act.  E-mails manually designated by users as "non-records" are, as a general matter, stored only temporarily on ARMS, until they are sample-audited for compliance with the standards for non-records designation.  (Second Decl. Of Leanna F. Terrell ¶ 3,  Jan. 8, 2001.)

1998, wrote a letter to plaintiffs' counsel explaining EOP's position with regard to searching for and producing archived e-mail.  (*See* Allison Giles Ltr. to Larry Klayman, Ex. 1 to Pl. Opp. to EOP's Mot. to Dismiss ("Giles-Klayman Ltr."), at 5, Jan. 13, 1998.)  Counsel for EOP explained in the letter that "EOP e-mail, at least during the time most relevant to this lawsuit, was not archived in a unified, logically formatted database and cannot be word-searched except at enormous time and expense."  (*Id.* at 3.)  In addition, "EOP is currently engaged in the process of restoring pre-July 1994 e-mail to tapes in the equivalent word-searchable format as post-July 1994 e-mail."  (*Id.* at 4 n.1)  Counsel said EOP would be willing to perform a word search of e-mail that was limited to certain dates and specified users.[4]  (*Id.* at 2.)

Meanwhile, on January 30, 1998, while conducting a search of ARMS records in response to a subpoena from the Office of the Independent Counsel, Barry noticed an "anomaly."  (Aug. 3 Tr. 72.)  It appeared that only the outbound part of an e-mail "conversation" between Ashley Raines ("Raines") of OA and Monica Lewinsky ("Lewinsky") (then employed outside the White House) had been received by ARMS.  (*Id.* at 68-69.)  Upon investigation, and in consultation with NG employee John Spriggs ("Spriggs"), Barry determined that some inbound e-mails in this conversation appeared to have successfully entered the Lotus Notes e-mail system but had not been received by or stored in ARMS.  (*Id.* at 69-70; Pl. Ex. 9-49.)  Barry did not attempt to determine whether this was an episodic problem, or a systemic one, capable of repetition.  (Aug. 3 Tr. 72.)  Because there were a substantial number of inbound e-mails from

---

[4] The letter was based on information provided by Barry at meetings with Sally Paxton of the White House Counsel's Office and Kate Anderson of OA's Office of General Counsel in December 1997.  (Aug. 21 Tr. 37; Pl. Exs. 40-2865, 2869.)  Barry explained the difficulties of reconstructing e-mail from All-in-One backup tapes, on which pre-July 1994 e-mail was stored.  (*Id.* at 39-40.)

Lewinsky already stored in ARMS, however, Barry suspected that it was not systemic.  (*Id.*)

Barry reported his finding to his immediate supervisor, Jim Wright, and at Wright's direction, he

prepared an "incident report" documenting what he had found.  (Pl. Ex. 9-49.)

  In response to the 30(b)(6) Notice, EOP filed a Motion for a Protective Order on March 4,

1998.  (*See* Mot. for Prot. Order, Mar. 4, 1998.)  Consistent with the January 13, 1998 letter to

plaintiffs' counsel, EOP argued in the motion that, among other things, "[w]holesale restoration

and searches of years-old backed-up and archived e-mail" would be "burdensome, costly, and

unlikely to lead to responsive documents."  (Mem. Supp. Mot. for Prot. Order 10.)

  In support of its motion, EOP submitted a declaration from Barry dated March 4, 1998.

(*See* Pl. Ex. 18.)  This declaration was the product of consultation between DOJ, White House

Counsel's Office, and Barry.  (*See*, *e.g.*, Aug. 3 Tr. 122-26; Aug. 21 Tr. 58-59; Aug. 22 Tr. 45-

47; Pl. Ex. 40-2888; Pl. Ex. 46; Pl. Ex. 49.)  It "discusses the processes required for the

restoration and reconstruction of backed-up EOP e-mail, and the resources required for these

tasks."  (Pl. Ex. 18 ¶ 3.)

  Barry explained in the declaration that, prior to July 14, 1994, there was no system in

EOP for archiving e-mail in word-searchable format, although there were backup tapes for this

period.  (*Id.* ¶ 4.)  For backed-up e-mail to be searched, the data had to be restored (to on-line

status) and reconstructed (pieced together in a word-searchable and printable format).  (*Id.* ¶ 5.)

Barry described the lengthy process of restoring and reconstructing backup tapes as "time-

consuming and resource-intensive."  (*Id.* ¶¶ 6-10.)  Barry also explained that, in response to court

orders in *Armstrong*, the Information Systems and Technology ("IS&T") branch of OA was "in

the process of restoring and reconstructing pre-July 1994 e-mail to a word-searchable format."

(*Id.* ¶ 10.)  Barry's explanation of the restoration and reconstruction of e-mails was made with reference to the All-in-One e-mail system with which he was familiar.  (Aug. 3 Tr. 161.)

In contrast, Barry said, "[s]ince July 14, 1994, e-mail within EOP has been archived weekly in an online format that is susceptible to being word-searched."  (Pl. Ex. 18 ¶ 11.)  By this statement Barry claims that he intended to describe what ARMS does, which is to archive e-mail.  (Aug. 3 Tr. 150.)  Barry claims that he did not intend by this statement to declare categorically that "all" post-July 14, 1994, e-mail had been received by and was stored in ARMS, because like other computer experts, he knew that computer systems are subject to glitches, and he testified that he would never say that any system is going to perform a certain task on every single occasion.  (*Id.* at 162; Aug. 22 Tr. 88.)

At the time he worked on his declaration, Barry did not tell counsel about the anomaly he found on January 30, 1998, or the incident report he prepared about it, (Pl. Ex. 9-49), because – he testified – they did not seem to him relevant, (Aug. 22 Tr. 92).  Barry claims that he saw a clear distinction between what ARMS does and what ARMS contains.  (*Id.* at 91.)  In his declaration, Barry testified that he believed he was only describing what ARMS does and not what was in it.  (*Id.* at 91-92.)  Therefore, at the time Barry signed the declaration, he believed that his entire declaration, including his description of ARMS, was accurate.  (*Id.* at 107.)

In their Opposition to EOP's motion, plaintiffs argued that the discovery sought by their 30(b)(6) Notice was necessary to obtain information about EOP's e-mail and other computer information systems and to overcome EOP's objections that the search for and production of e-mail and computer-stored documents would be too time-consuming and expensive.  (Opp. to Mot. for Prot. Order 9.)  Plaintiffs also submitted a declaration from Paul Hill, who they

presented as their own computer expert, to counter EOP's contentions concerning burden. (*Id.*)

In response to Hill's declaration, EOP submitted a supplemental declaration from Barry, dated March 30, 1998. (Pl. Ex. 44.) Barry's supplemental declaration, like his original declaration, refers in part to "the restoration and reconstruction of backed-up EOP email." (*Id.* ¶ 4.) Barry claims that he intended his reference to e-mail to mean All-in-One email, because that was the subject of his original declaration and that was the e-mail system with which he worked extensively. (Aug. 18 Tr. 20.) Barry addressed All-in-One reconstruction in both declarations because he was responsible for reconstruction of All-in-One email from backup tapes. (*Id.* at 20, 22.)

### 3.    <u>The Barry Deposition</u>

On April 13, 1998, the Court ruled on EOP's Motion for a Protective Order. 188 F.R.D. 111. As to e-mail, the Court "conclude[d] that the EOP is not required to completely restore all deleted files and e-mail as plaintiffs insist." *Id.* at 117. Rather, as counsel for EOP had suggested in their January 13, 1998 letter, the Court found that plaintiffs had the option of pursuing discussions with DOJ "regarding targeted and appropriately worded searches of backed-up and archived e-mail and deleted hard drives for a limited number of individuals." *Id.* (citing EOP's 30(b)(6) Reply 8 n.7).

However, the Court did permit plaintiffs to depose "individuals with relevant knowledge of the . . . e-mail systems at the offices relevant to this case in an effort to determine whether any other means exist to restore the deleted . . . e-mail of specific individuals' computers." 188 F.R.D. at 117. The offices identified as relevant were the White House Office and OA, to the extent it supported the White House Office. *Id.* at 118. Consequently, EOP designated Barry –

the person most knowledgeable about All-in-One e-mail, the *Armstrong* reconstruction, and ARMS – for deposition.

Barry testified that he understood that the subject matter of his deposition would be the same technical areas that were covered by his first and supplemental declarations.  (Aug. 17 Tr. 108, 112.)  In particular, he understood the deposition would focus upon his expertise with the All-in-One e-mail system and with ARMS.  (Aug. 3 Tr. 62, 186, 191.)  Barry testified that because he was comfortable with these substantive areas, he did not review them with DOJ counsel and White House counsel when they met with him to prepare for his deposition.  (Aug. 17 Tr. 108-09, 112-13.)  The preparation was limited largely to reviewing the logistics and format of the deposition, because Barry had never been deposed before.  (*Id.*)

Plaintiffs' counsel deposed Barry on June 11, 1998.  (Pl. Ex. 50.)  Barry was asked about the location of e-mails, and he responded that the e-mail messages from July 14, 1994 onward "currently reside in the ARMS, Automated Records Management System data warehouse."  (*Id.* at 145.)  As before, Barry claims that he understood this question to concern All-in-One e-mail messages destined for ARMS.  (Aug. 3 Tr. 183.)  When asked "[w]hat percentage of the White House Office, OA E-mail users can send E-mail messages using ALL-IN-1," Barry responded that 100% could do so.  (Pl. Ex. 50 at 189.)  Barry believed that 100% could also use Lotus Notes e-mail, (*id.* at 189-90), but he observed that he is "not a Lotus [N]otes expert by any means," (*id.* at 244).

Barry also testified at his deposition that he was not aware of any e-mails after November 1992 being lost or destroyed before they could be backed up properly.  (Pl. Ex. 50 at 229.)  Barry also testified that e-mail sent to EOP accounts from outside EOP would be received and archived

in ARMS just as if it had been sent from inside EOP.  (*Id.* at 274, 283.)  Barry claims that he did

not perceive any link between the questions he was asked at his deposition concerning what he

understood to be the All-in-One e-mail system and the anomaly he discovered in January.  (Aug.

3 Tr. 187.)

### 4. Discovery of "Mail2" Problem

In June 1998, the anomaly Barry had noted in January 1998 was proven to be a systemic

problem.  NG employees Robert Haas ("Haas") and Yiman Salim ("Salim"), during a June

training session to bring the newly-hired Salim up to speed, discovered the existence of e-mail

from the Lotus Notes e-mail system which had never been transferred to ARMS.  (*Id.* at 185.)

After reporting the discovery to their supervisor, Betty Lambuth ("Lambuth"), the NG group,

which also included Spriggs and Sandy Golas ("Golas"), determined that the cause of the

problem was a coding error – specifically, the use of upper case letters rather than mixed case

letters to identify the Mail2 server which handled Lotus Notes e-mails of certain users.  They

discovered that because the Notes-ARMS interface program was case sensitive, this error had

caused incoming internet e-mail from systems outside the EOP to affected Lotus Notes accounts

on the Mail2 server not to be transferred into the ARMS system.  (*Id.* at 194.)[5]

At the time NG initially discovered the Mail2 problem, Barry was not informed.  (Aug. 3

Tr. 86; Aug. 18 Tr. 115, 121.)  When Barry returned from a trip in early July, he was instructed

first to report to his supervisor, Kathleen Gallant ("Gallant"), and then to Lambuth.  (Aug. 3 Tr.

---

[5] During the reconstruction of e-mail from backup tapes, it was determined that the Mail2 problem was not limited solely to incoming internet e-mail, as the technicians had previously believed.  Rather it affected e-mail coming into the Mail2 server from any external system.  (*See* Pl. Ex. 116; Nov. 2 Tr. 60-61, 69.)

86; Aug. 18 Tr. 115; Aug. 22 Tr. 94.)  It was during his briefings on July 6, 1998 that Barry

learned, for the first time, of the systemic Mail2 problem.  (Aug. 3 Tr. 86.)

    That same week, Barry reviewed his deposition transcript.  (Aug. 3 Tr. 194; Aug. 17 Tr.

72-73.)  Barry understood that this was his opportunity to make any changes he thought were

necessary, substantive or otherwise, to correct his deposition.  (Aug. 17 Tr. 74, 77.)  Barry

availed himself of that opportunity, marking up his copy of the deposition transcript with the

requested corrections and faxing the marked-up pages to DOJ counsel Julia Fayngold

("Fayngold") for the preparation of an errata sheet.  (Pl. Ex. 47; Aug. 22 Tr. 40-41, 96.)  The

changes Barry made were all of a clerical nature.[6]  (*Id.* at 96-97.)

    Although Barry sent deposition corrections to Fayngold the same week he learned of the

Mail2 problem, he claims that he did not connect that knowledge with his deposition testimony.

(Aug. 22 Tr. 100.)  That testimony had focused instead on ARMS and the process of searching

ARMS and had touched on the All-in-One e-mail system.  The Mail2 problem, in contrast, was

not a problem with ARMS itself but with the Notes-ARMS interface; the Mail2 server was

separate from the ARMS hardware; and neither the Mail2 problem nor the Mail2 server affected

the process by which one searches ARMS.  (*Id.* at 100-01; Aug. 3 Tr. 68, 101.)  Similarly, Barry

testified that it never crossed his mind to go back and amend his first declaration because there

was no connection in his mind between the Mail2 problem and the earlier declaration describing

_____

    [6] None of the markings that appear on deposition pages, other than those pages sent to
Fayngold, were made at the time Barry reviewed his deposition for corrections.  (*See* Pl. Ex. 39.)
Barry does remember adding some highlighting and underlining to the transcript during the early
part of 2000, when he reviewed his deposition in preparation for his congressional testimony.
(*Id.* at 1051728-83; Aug. 22 Tr. 51, 98.)  The bars and lines that appear in the margins of Pl. Ex.
39, however, were not made by Barry but by OA Counsel.  (Aug. 22 Tr. 53; *compare* Pl. Ex. 50
*with* Pl. Ex. 39.)

the All-in-One reconstruction effort and the process by which ARMS is searched.  (Aug. 22 Tr. 95-96.)  Because Barry never made a connection in his own mind between the Mail2 problem and his prior statements in the *Alexander* case, he never advised the lawyers he had worked with on the case, in either the White House Counsel's Office or DOJ, of the Mail2 problem.  (Aug. 22 Tr. 100, 106-07.)  This is the type of compartmentalized thinking of a computer expert to which the Court made reference earlier.  Plaintiffs would have this Court conclude that Barry is lying and participating in a conspiracy and a deliberate cover-up.  The Court concludes to the contrary. Barry has truthfully described his thought process.  Flawed as it is, he genuinely believes he told the truth in his declaration and at his deposition.  It turned out, unfortunately, that Barry made statements in his declarations and deposition that simply were not true.

### 5.   Reaction to the Mail2 Problem

As soon as NG discovered the Mail2 problem, NG employees notified their government counterparts, who in turn immediately advised the appropriate officials within OA.  (Aug. 23 Tr. 5-8; Aug. 2 Tr. 38-39.)  Action was taken on two fronts.  First, OA and NG were instructed to find a way to fix the problem, or as that process soon became known, to "stop the bleeding." (Aug. 23 Tr. 97.)  OA's primary concerns were document preservation and compliance with archival requirements, and it assigned the task of fixing the problem to NG contractual employees and technicians within OA.  (Aug. 23 Tr. 9-10, 23.)  Second, OA management made sure that government officials outside OA who needed to be advised of the problem because of outside information requests were so advised.  Thus, Mark Lindsay ("Lindsay"), then General Counsel of OA, advised the Assistant to the President for Management and Administration, the Deputy Chief of Staff of the White House, and the Counsel to the President about the problem.

(Sept. 22 Tr. 32-35; Aug. 23 Tr. 18, 45-46.)  Action on these two fronts proceeded as follows:

(a)      **Fixing the problem and preserving records**

In June 1998, after NG employees learned of the Mail2 problem, they advised their supervisor Lambuth, who in turn, advised Laura Crabtree ("Crabtree"), the IS&T Desktop Branch Supervisor, who in turn, advised Lindsay, (Aug. 23 Tr. 5-8.)  Lindsay informed OA Director Ada Posey ("Posey") and Assistant to the President for Management and Administration Virginia Apuzzo ("Apuzzo"), and Posey assigned Lindsay and OA procurement counsel Kate Anderson the task of working with NG to fix the Mail2 problem.  (Aug. 16 Tr. 188-89; Aug. 23 Tr. 24.)

The plan for fixing the Mail2 problem involved a two-step process.   The first was the prospective fix ("stopping the bleeding"), which would involved recoding "MAIL2" to "Mail2" for the affected e-mail users, thereby allowing external e-mail on the Mail2 server to pass through the Notes-ARMS interface program and enter ARMS.  (Aug. 14 Tr. 133-34; Aug. 23 Tr. 97.)  The second step was to restore from backup tapes those e-mails which had not entered ARMS and move them into ARMS.  (Sept. 22 Tr. 67-68.)  But the execution of this plan was slowed by several factors.

First, shortly after the Mail2 problem was discovered, NG underwent a series of changes in both its management and organizational structure at EOP.  In particular, NG relocated both Lambuth and her superior, Stephen Hawkins ("Hawkins"), and the employees responsible for working together to resolve the Mail2 problem were reassigned to separate working groups and given new responsibilities.  (Aug. 1 Tr. 50; Aug. 15 Tr. 34.)  As a result, the NG employees lacked both the mandate and guidance they required from their management to address the Mail2

problem, and it was not until the early fall of 1998, when they reached out to their company counsel, that they received the direction they were seeking.  (Aug. 14 Tr. 54-56, 71-74.)

Second, progress on the prospective fix of Mail2 was delayed by a dispute over the scope of NG's contract.  NG initially took the position that because the Mail2 problem was caused by a coding error made when the previous contractor, PRC, Inc., was responsible for the Notes-ARMS interface program, the task of fixing the Mail2 problem was outside the scope of NG's contract and therefore, not its responsibility.  Thus, shortly after the discovery of the Mail2 problem, NG supervisor Hawkins advised Lindsay that NG would not do any work on the problem.  That triggered an extensive period of negotiations between NG and OA.[7]

Eventually, in December 1998, NG did submit a proposal, not to fix the Mail2 problem, but to study how to do so, at a cost of $600,000.  OA officials, including Posey and Lindsay, found this proposal merely to study the problem to be far too expensive.  (Aug. 16 Tr. 189-90; Aug. 23 Tr. 191; Pl. Ex. 9-64.)  The cost seemed especially high in view of the fact that OA was then struggling with limited resources, including a recent 25% staff cut, and the daunting task of insuring that all OA computer systems were made Y2K compliant. (Aug. 16 Tr. 110; Aug. 17 Tr. 58-59; Sept. 22 Tr. 82-83.)

---

[7] The negotiations between NG and OA began in September 1998 and continued through at least the beginning of 1999.  The subject of the negotiations was a new agreement to restore the backed up e-mails, a process which involved such routine steps as NG's preparation of appropriate contract proposals (a "statement of work"), its acquisition of necessary software and hardware to assess the problem, inventories and quality checks of the tapes, and NG's submission of a cost estimate (a "rough order of magnitude").  (*See* Def. Ex. 29-40.)  This process was undertaken in the ordinary course of business, without any special concerns for confidentiality.  (Nov. 3 Tr. 94-95.)  While NG ultimately agreed to undertake the task of "stopping the bleeding," it continued to maintain that restoration of the backed up e-mails was beyond the scope of its contract.  (*Id.* at 47-48.)

In the meantime, OA took steps to preserve the e-mails affected by the Mail2 problem by preserving the backup tapes rather than recycling them, as was the ordinary practice.[8]  (Aug. 23 Tr. 101.)  The need to purchase new tapes instead of recycling the old ones created further demands on OA's limited budget.

While OA and NG engaged in unsuccessful negotiations to restore the backup tapes, OA acted to "stop the bleeding" by having NG recode "MAIL2" to "Mail2" for the affected e-mail users, to allow external e-mail to pass through the Notes-ARMS interface program and enter ARMS.  (Aug. 14 Tr. 22; Aug. 23 Tr. 191.)  Thus, in November 1998, the Mail2 problem was prospectively fixed.[9]

**(b)** **Alleged threats to NG employees**

Plaintiffs offered testimony from Lambuth, Haas, and Golas that when the Mail2 problem was first detected, NG employees were threatened with adverse consequences, including

---

[8] Some tapes created in 1998 and 1999 (long after the events at issue in the underlying case here) – approximately six months' worth – were inadvertently recycled at the direction of Gallant, then director of IS&T.  Gallant quickly ordered a halt to the recycling, however, as soon as she learned of the order to preserve the backup tapes.  (Aug. 1 Tr. 201-03.)  Apart from this inadvertent recycling, backup tapes which may contain e-mail affected by the Mail2 problem are to this day being preserved.

[9] In the process of fixing the Mail2 problem prospectively, a new problem, known as the "letter D" problem, was created.  (Aug. 16 Tr. 22.)  As a result of the letter D problem, the incoming e-mail for 191 people in EOP whose first names began with "D" was not records-managed beginning in November 1998.  (Pl. Ex. 39-3220; Pl. Ex. 9-125 at 3949-50.)  The problem was discovered on April 9, 1999.  (*Id.*)  After it was identified, NG stopped recycling tapes in order to avoid the loss of e-mails.  (Aug. 14 Tr. 179; Aug. 15 Tr. 82.)  It was fixed prospectively in May or June 1999.  (Aug. 16 Tr. 22; Pl. Ex. 40-3104.)  The letter D issue is not relevant to the present case because none of the users that the Court identified as relevant to the case were affected by the error.  D. Craig Livingstone's account was not affected because his departure from the White House (in June 1996) predated the letter D problem (as well as the Mail2 problem).  (*See* Aug. 16 Tr. 127, 129 (letter D problem began affecting e-mail in October 1998; "bleeding stopped" in May 1999).)

16

termination of employment and possible jail terms, if they revealed its existence.[10]

Lambuth testified that then-IS&T branch supervisor Crabtree related to her that then-OA General Counsel Lindsay had threatened the NG group, including Lambuth, Spriggs, Salim, Haas, and Golas, with jail terms if they disclosed the Mail2 problem.  (Aug. 1 Tr. 18-19.)  According to Lambuth, after Crabtree related the alleged threats to her, Lambuth conveyed them to her staff.  (*Id.* at 22.)  Lambuth testified that Lindsay made the alleged threat in a separate meeting with the NG group and Crabtree in Crabtree's office, with Lindsay participating via speaker phone.  (Aug. 1 Tr. 28-29.)  Lambuth also testified that Lindsay threatened her during a meeting she attended in the office of Paulette Cichon, a claim that both Lindsay and Cichon have denied.  (Aug. 23 Tr. 37; *see* Aug. 1 Tr. 92.)

In contrast, neither Haas nor Golas testified to hearing the alleged threats from either Lambuth or Lindsay.  Haas testified that is was Crabtree, not Lindsay, who referred to jail in response to a flippant comment by Haas about the consequences of discussing Mail2 with his wife.  (Aug. 15 Tr. 32-33.)  Golas testified only that she heard the word "jail" without knowing who said it.  (Aug. 2 Tr. 164.)  Lindsay denied making any threats, (Aug. 23 Tr. 36-37), and Lambuth and Golas testified that both Spriggs and Salim denied ever hearing the alleged threats, (Aug. 1 Tr. 87; Aug. 2 Tr. 165).

In any event, all participants in the initial discussions about the Mail2 problem agreed that

---

[10] A fourth NG employee, Sheryl Hall ("Hall"), testified to hearsay knowledge of the alleged threats from Haas.  Hall's testimony concerning what Haas told her differed materially from Haas' own testimony.  The Court credits Haas' testimony.  Hall also admitted to false and misleading statements in her declarations, (July 31 Tr. 167-72), as well as material omissions from her declarations, (*id.* at 174-79), and personal bias against the First Lady and EOP personnel for a variety of perceived personal and employment slights, (*id.* at 173, 183-84).  (*See also* Aug. 15 Tr. 20-23 (Haas testimony concerning Hall's personal biases).)

it was important and reasonable to keep their discovery of the Mail2 problem confidential until they had a fuller understanding of its nature and scope.  (Aug. 1 Tr. 79; Aug. 2 Tr. 167-68; Aug. 15 Tr. 25-29; Aug. 23 Tr. 23.)  Indeed, Haas and Golas testified that at the conclusion of a meeting about the subject, Lambuth, turning to the NG employees, gave the request for confidentiality her stamp of approval by asking whether each of the NG employees understood the request.  (Aug. 2 Tr. 167-68; Aug. 15 Tr. 30-32.)

The instructions concerning confidentiality were soon countermanded.  Gallant, the IS&T supervisor, learned of the Mail2 problem within a few days of its discovery by the NG employees, and she took steps to have her staff address it.  (Aug. 1 Tr. 219-21.)  For example, she instructed Barry to obtain a full briefing on the problem from Lambuth upon his return on July 6.  (Aug. 3 Tr. 86.)  Barry communicated freely with NG and IS&T employees on the Mail2 matter, and openly expressed his concerns about it in a series of e-mails.  (*See, e.g.*, Pl. Exs. 9-25, 9-40, 9-52.)  He was never instructed to remain silent about the problem.  (Aug. 22 Tr. 94-95.)  Gallant also instructed her staff to stop using the term "Project X"[11] when referring to the plans to fix the Mail2 problem because it sounded unnecessarily sinister.  (Aug. 1 Tr. 219-21.)  In addition, to reassure the NG employees, Gallant removed Crabtree from the Mail2 project.  (Aug. 3 Tr. 222-23.)

Lambuth, Haas, and Golas apparently understood that they needed clearance before discussing the matter with their NG supervisors.  However, the first time discussions with NG supervisors came up (during a confrontation between Golas and NG supervisor Stephen

---

[11] The project was dubbed "Project X," apparently in reference to the then-popular television series "The X Files."  (Aug. 15 Tr. 45-46.)

18

Hawkins), Lindsay spoke with Hawkins to defuse the misperception about secrecy that NG employees harbored.  (Aug. 15 Tr. 36-38.)[12]

Gallant also told Hawkins that NG should arrange for the NG Mail2 group to meet with the company's legal counsel, so that the NG employees could be advised of their legal rights and reassured that there was no cause for concern.  (Aug. 1 Tr. 220-22.)  The NG employees sought and obtained a meeting of that kind, on September 9, 1998, at which they discussed their concerns about the Mail2 matter with in-house counsel for NG.  (Aug. 14 Tr. 54-55; Nov. 1 Tr. 82-85, 94-95.)  There is no evidence that alleged threats of retaliation were communicated to NG in-house counsel at that meeting.[13]  (*See* Dec. 22 Tr. 29-30, 62, 86-87, 152, 162-63, 166, 169, 208.)  After that meeting, the NG employees also met with Hawkins, and Hawkins advised them that there was no reason to fear retribution over Mail2.  (Aug. 14 Tr. 71, 74.)

After receiving these reassurances, Haas realized that the NG employees had blown the matter of alleged threats out of proportion, and that he had let his imagination run wild.  He felt "childish" about it and admitted that the whole thing may have been the product of "too many spy novels."  (Aug. 15 Tr. 34-37.)[14]  Indeed, after receiving these reassurances, Haas forgot about

---

[12] Lindsay also testified that OA employees knew about the Mail2 problem, and that he had discussions with NG about whether the task of fixing the problem fell within NG's existing contract.  Based on those contacts, he concluded that NG's legal and contracting departments knew about the problem.  (Aug. 23 Tr. 123.)  NG in-house counsel Ralph Pope first learned of the problem in the spring or early summer of 1998.  (Dec. 22 Tr. 128, 202.)

[13] Haas testified that he spoke of "threats" at that meeting, (Aug. 14 Tr. 60-61), but he did not specify whether he was referring to the instruction not to discuss the problem outside his group, or threats of jail or retaliation, (*see* Dec. 22 Tr. 171-72, 204 (noting ambiguity of the word "threat")).

[14] Haas' candid reappraisal of the NG employees's fears after their meeting with Hawkins may explain why Haas disclosed to Hall – according to her testimony – the very same facts that

the alleged threats.  (Aug. 14 Tr. 74.)

Also following the September 9th meeting, NG's director of contracts and pricing, Joseph Lucente ("Lucente"), and NG's corporate counsel, Ralph Pope ("Pope"), sent a letter dated September 14, 1998, to Dale Helms, EOP's contracting officer.  In this letter Lucente, on behalf of NG, complained that another EOP employee (namely, Crabtree) had directed NG employees to perform repair tasks on the Mail2 problem that NG believed were outside the scope of its contract with EOP.  (Pl. Ex. 9-64; Nov. 1 Tr. 101.)  Concurrently, NG retained Earl J. Silbert ("Silbert") as outside counsel to contact the White House Counsel's office and make sure it was aware of Lucente's letter and to advise it that NG attorneys were available to discuss the matters it raised.  (Oct. 3 Tr. 40-41, 100-01; Dec. 22 Tr. 23-24, 57-58, 69-70, 75-77, 152, 162-63, 169, 208.)

Lucente's letter made no mention of any threats to NG employees that they would be fired or jailed if they disclosed the Mail2 problem.  (See Pl. Ex. 9-64.)  Similarly, Silbert recalled no discussions about threats with the White House Counsel's office, NG's in-house counsel, the NG employee[15] whom he interviewed, or anyone else in 1998.  Silbert was confident that if he had had such discussions, he would have remembered them.  (Oct. 3 Tr. 54, 63, 65, 73-74, 80, 83; Dec. 20 Tr. 48, 49, 72-75.)  Both White House Counsel Charles Ruff and Lanny Breuer, the White House attorney whom Silbert called, similarly recalled no conversation with Silbert about threats to NG employees or any other aspect of the Mail2 problem.  Breuer testified that if he had had discussions about these threats, he would have advised the White House Counsel.  (Oct. 19

---

he allegedly risked jail for revealing.  (See July 31 Tr. 163-64.)

[15] This was most likely Haas.  (See Aug. 14 Tr. 56-67.)

Tr. 65, 68-71 (morning session).)  Ruff testified, however, that he learned of the alleged threats from the press.  (Aug. 28 Tr. 71-72, 130.)

Pope and Lowell Brown, the NG corporate counsel who handled the Mail2 matter and to whom Silbert reported his conversations with the White House, also heard nothing about discussions of threats to NG employees.  (Dec. 22 Tr. 29-30, 62, 86-87, 152, 162-63, 166, 169, 208.)  Indeed, neither of these individuals – Pope, who met with the NG employees on September 9, 1998, and Brown, then head of internal investigations for NG and the person who retained Silbert – was even aware in 1998 of allegations that NG employees had been threatened with firing or jail, or heard of such allegations before the year 2000.  (*Id.* at 62-65, 88-89, 151-53, 175-76.)  Both Silbert and Brown testified that had any credible evidence of the alleged threats been brought to their attention, they would have engaged in thorough internal investigations to determine whether there was cause to take further action.  (Oct. 3 Tr. 68-71; Dec. 22 Tr. 91-93, 95.)

### (c)    Federal Records Act issue

Lindsay, as OA general counsel, was not only concerned with fixing the Mail2 problem, but was also aware that it potentially raised serious issues about the preservation of records in compliance with the Federal Records Act and compliance with subpoenas and document requests.  (Aug. 23 Tr. 98-99.)  With respect to the Federal Records Act issue, Lindsay called Jason Baron ("Baron"), then a trial attorney in the Federal Programs Branch of DOJ, during June or July of 1998.  (*Id.* at 98-100; Aug. 31 Tr. 47.)  Baron was knowledgeable about the Federal Records Act and its construction by the District of Columbia Circuit in the *Armstrong* case, and Lindsay wanted to be briefed about that to determine whether the Mail2 problem presented an

21

*Armstrong* issue.  (*Id.* at 48.)

Baron met with Lindsay the day after Lindsay called.  (*Id.* at 46.)  Lindsay described the Mail2 problem generally to Baron, and Baron learned that the problem was a recent one and had to do with external e-mail coming into the EOP but not entering ARMS.  (*Id.* at 49-53.)  The conversation between Lindsay and Baron did not concern the present case, (Aug. 23 Tr. 101), nor did Lindsay or Baron even refer to this case at any point during the conversation,[16] (Aug. 31 Tr. 135).

Baron concluded that the Mail2 problem, as described to him by Lindsay, did not implicate *Armstrong* because of the contemporaneous time-frame of the problem, because it only involved external e-mail coming into presidential records components of EOP, and because it was not the result of an intentional act.[17]  (*See* Aug. 23 Tr. 100-01.)  For these reasons, and because Lindsay told him that EOP was working to solve the problem, Baron apparently did not inform his supervisor in the Federal Programs Branch about the Mail2 problem, and he did not relate his conversation with Lindsay to any member of the DOJ trial team in this case.  (Aug. 31

---

[16] Baron was not an attorney assigned to the present case.   His involvement in it was limited, in a consultative capacity, to reviewing at least one and possibly two draft declarations of Barry, (Aug. 31 Tr. 87-89), and discussing a technical aspect of Barry's deposition transcript with one of the attorneys (James Gilligan) assigned to the case, (*id.* at 111-12, 115).  Baron did not keep up with the allegations in the case, (*id.* at 101-02), and his working knowledge of it was that it involved events early in the Clinton Administration known as "Filegate," (*id.* at 138).  No one had told Baron about a discovery dispute in this case relating to e-mails, and he was not aware of any document productions made by defendants in it.  (*Id.* at 135, 138.)

Lindsay, too, was unfamiliar with document requests in the present case.  (Aug. 23 Tr. 193.)  Lindsay testified that is why he saw no reason to seek out and advise the attorneys assigned to this case about the Mail2 problem.  (*Id.*)

[17] *Armstrong* dealt only with the Federal Records Act, not the Presidential Records Act, and only with records created through July 14, 1994.  (Aug. 31 Tr. 52-53.)

Tr. 82-83, 105, 135.)

### (d)    Compliance with information requests

As noted above, Mark Lindsay understood that the Mail2 problem not only implicated

records preservation issues, but also raised concerns about compliance with information requests.

(Aug. 23 Tr. 98-99.)  As a result, after Lindsay learned of the problem around June 18, 1998, and

advised Apuzzo, Assistant to the President for Management and Administration, Lindsay asked

his staff (at Apuzzo's direction) to prepare a memorandum outlining the nature of the problem.

(Aug. 23 Tr. 6; Sept. 22 Tr. 33; Pl. Ex. 9-1.)  Apuzzo also asked Lindsay to inform Counsel to

the President Charles F.C. Ruff ("Ruff"), of the problem, both by memorandum and in person.

(Aug. 23 Tr. 34, 36; Sept. 22 Tr. 33, 39, 44; Pl. Ex. 9-1.)

Lindsay converted the memorandum that was prepared for him, (Pl. Ex. 9-136), into a

memorandum from Apuzzo to Deputy Chief of Staff John Podesta ("Podesta"), (Aug. 23 Tr. 45).

That memorandum, dated June 19, 1998, advised Podesta of an "anomaly" involving the Mail2

server by which incoming internet e-mail in some users' accounts was not being transferred to

ARMS.  (Pl. Ex. 9-4.)  The memo also explained that "[a]n important function the [ARMS]

system supports is the identification and retrieval of documents in response to information

requests."  (*Id.*)

Podesta received the memorandum and by way of a note in the margin, directed Apuzzo

to have Lindsay brief him on the problem.  (Pl. Ex. 9-4; Sept. 22 Tr. 44.)  Apuzzo also sent a

copy of the memorandum to Ruff on June 19, 1998.  (Aug. 23 Tr. 48; Sept. 22 Tr. 40, 43; Pl. Ex.

9-1.)

Lindsay had a "relatively brief" meeting with Ruff on June 19, 1998.  (Aug. 23 Tr. 55;

Aug. 28 Tr. 62.)  Lindsay, who knew little more at the time than what was in the memorandum,

conveyed to Ruff the "sum and substance of what . . . is contained in the memorandum."  (Aug.

23 Tr. 56; Aug. 28 Tr. 62.)  He told Ruff that his office would try to fix the problem as soon as

possible.  (Aug. 23 Tr. 57.)

At about the same time, Lindsay had a "very short meeting" with Podesta, (Aug. 23 Tr.

66), in which he informed Podesta of essentially the same information that was in the

memorandum, (*id.* at 63; Oct. 10 Tr. 53).  Podesta wanted to make sure that the White House

Counsel's office had been advised, and that Lindsay was "going to be working with the counsel's

office to address the issue."  (Aug. 23 Tr. 65; Decl. of John Podesta, Ex. 1 to EOP's Mot. for

Reconsideration of Order of Sept. 12, 2000 ("Podesta Decl."), ¶ 5; Oct. 10 Tr. 52-53.)  The

conversation between Lindsay and Podesta involved the nature of the computer anomaly and the

fact that Lindsay was going to work on it, (Podesta Decl. ¶ 5), not how it may have affected

document production, (Aug. 23 Tr. 65).  After being reassured by Lindsay that Ruff was

informed of the problem, Podesta had no further conversations with Lindsay about Mail2, and he

heard nothing more about it until the year 2000.  (Oct. 10 Tr. 58-59.)

After learning of the Mail2 problem from Lindsay, Ruff told Deputy White House

Counsel, Cheryl Mills ("Mills"), about his conversation with Lindsay and discussed with her the

need to find out whether the Mail2 problem affected prior document productions.  (Aug. 28 Tr.

81-82.)  Although Ruff appreciated that the problem may have affected prior document

productions, (*id.* at 83), the matter that was "the most current and pre-eminent" concern to him at

the time was the subpoenas involving Lewinsky from the Office of the Independent Counsel to

which his office had recently responded, (*id.* at 82-83).  Ruff was unaware of any request for

production, or search, of e-mail in the present case, (*id.* at 48, 128), and he did not focus

particularly on this case at the time, (*id.* at 84).

Mills' recollection of this conversation is that Ruff informed her that "there was a

problem with the e-mail, and certain e-mails may or may not have been captured with respect to

the Lewinsky investigation; that OA was conducting a search." (Sept. 1 Tr. 83.)  Mills testified –

somewhat curiously – that Ruff did not show her the Apuzzo memorandum describing the e-mail

problem.  (*Id.* at 86.)  Mills testified that her "impression" was that the e-mail problem affected

only the Lewinsky investigation, not any other case or investigation.  (*Id.* at 85.)  She understood

"that Mr. Lindsay had indicated [to Mr. Ruff] that there were certain e-mails that may or may not

have been captured, (*id.*), and she "assumed that Mr. Lindsay would communicate with OA

whatever steps needed to be taken" to ensure that any missing e-mails were located and brought

to the Counsel's Office for review.  (*Id.* at 79-80.)

This was the most critical error made in this entire fiasco.  Ruff properly followed up by

turning the problem over to his deputy to handle.  Mills' actions were totally inadequate to

address the problem.  Her failure was only compounded when Lindsay never raised a follow-up

question about what Ruff was doing and how the issue was being addressed and the problem

solved.  Lindsay's actions were those of the perfect bureaucrat – hand off the problem to

someone else and then wash your hands of it.  While the Court finds the actions of both Lindsay

and Mills to be loathsome, there is simply no evidence that they were motivated by an intent to

engage in a conspiracy or to obstruct justice.

Subsequent to Ruff's delegation of the issue to Mills, someone from the White House

Counsel's Office contacted Lindsay and asked that OA conduct a search of e-mail associated

with four named individuals.[18]  (Aug. 23 Tr. 142-43.)  Lindsay gave the names to Crabtree, and asked her to give them to the appropriate computer people to conduct the search.  (*Id.* at 43.)  The requested names reached Lambuth, who around June 20, 1998, asked Spriggs to check the e-mail files of four or five individuals to see if they contained any e-mail from Lewinsky.  (Aug. 2 Tr. 200; Aug. 14 Tr. 6, 29.)  Spriggs, who was working with Haas at the time, showed Haas the note in which Lambuth made the request, and the two worked together to perform the search.  (Aug. 2 Tr. 199-201.)[19]

Haas located about 400 e-mails from Lewinsky in the file of Raines, who was not on the list of names given to him but whose file he searched because of his knowledge of the January 1998 anomaly.  (Aug. 2 Tr. 201-02.)  At Lambuth's direction, Haas printed out those e-mails. (*Id.* at 203.)  With the exception of two e-mails, Haas never read any of them.  (*Id.* at 203, 207, 208-09.)  Haas gave the e-mails to Lambuth, and Lambuth delivered them to Lindsay.  (Aug. 14 Tr. 8, 10.)  Lindsay took the documents to the White House Counsel's Office and left them with an administrative assistant.  (Aug. 23 Tr. 144; *see also* Sept. 1 Tr. 72.)

When the approximately 400 printed out Lewinsky e-mails arrived, Mills asked Associate White House Counsel Michelle Peterson ("Peterson") to conduct a comparison between those e-mails and the Lewinsky e-mails that had been produced in response to a subpoena from the Office of the Independent Counsel.  (Sept. 1 Tr. 72-73; Aug. 28 Tr. 197.)  Peterson had the most

---

[18] Neither Ruff nor Mills recalled who selected these names.  (Aug. 28 Tr. 113; Sept. 1 Tr. 80.)

[19] Haas recalls that the names were upper-level executives at the White House, (Aug. 2 Tr. 200), but he could not remember them with certainty, (Aug. 14 Tr. 26, 29).  Haas found no e-mails from Lewinsky in the e-mail accounts of any of the four or five individuals on the list. (Aug. 2 Tr. 200-01; Aug. 14 Tr. 29.)

familiarity with the Lewinsky documents because she had handled the production to the

Independent Counsel.  (Sept. 1 Tr. 73.)

After examining the documents Mills gave her, Peterson realized that they were all e-

mails between Lewinsky and Raines.  (Aug. 28 Tr. 200.)  Consequently, she obtained from the

Office of Records Management copies of all the Lewinsky-Raines e-mails that had been

produced to the Independent Counsel, and she stacked them next to the stack of documents Mills

had given her.  (*Id.*)  Peterson then undertook the "ministerial task" of comparing the two stacks

to see whether all the e-mails in the stack she had gotten from Mills were also in the stack of e-

mails that had been produced to the Independent Counsel.  (*Id.* at 201-02.)  She found that

"everything that was in the stack that Ms. Mills gave [her] was also contained in the stack that

[they] had already produced to Independent Counsel Starr."  (Aug. 28 Tr. 202-03.)[20]

Peterson was "relie[ved]" that nothing had been omitted from the production to the

Independent Counsel, (*id.* at 203), and she concluded, as a result, that the problem Mills had

described to her was "a nonissue," (*id.* at 210).[21]  She then telephoned Mills and informed her

---

[20] On September 5, 2000, following her initial testimony in this proceeding, Peterson
appeared before the grand jury empaneled by Independent Counsel Robert Ray, and was
informed by prosecutors of small differences in the non-text portions of two of the e-mails she
had compared.  (In one case, two substantively identical e-mails had different time-stamps.  In
the other, one of the e-mails may have been missing a "cc:" list.) (Pl. Ex. 101 ¶¶ 4-8.)  It thus
appears that Peterson may have been mistaken, to that limited extent, when she concluded that
the two stacks of e-mails were identical.  (*Id.* ¶ 9.)  Nonetheless, such was, in fact, her belief from
June 1998 until her grand jury appearance in September 2000, and she stands by her testimony
that, after conducting the comparison, she concluded and reported that the e-mails she had been
given by Cheryl Mills were identical to the e-mails already produced to the Independent Counsel.
(*Id.* ¶¶ 6, 9; *see also* Nov. 2 Tr. 175-77.)

[21] Peterson had not been shown the Apuzzo memorandum describing the Mail2 problem,
nor was she otherwise made aware of the nature of the problem which occasioned the
comparison of Lewinsky e-mails.  (Aug. 28 Tr. 268.)  She surmised at the time "that there had

that the e-mails Mills had given her were the same as the e-mails that had been produced.  (*Id.* at

209-10; Sept. 1 Tr. 76.)  Mills passed this information along to Ruff, and in her mind, "that was

the end of the matter."  (Sept. 1 Tr. 108.)  Mills' totally inadequate performance of duty directly

led to all the adverse criticism the White House suffered in this document production fiasco.

When Ruff was informed that a comparison was done between the e-mails that had not

entered ARMS because of the problem Lindsay had told him about and the e-mails that had been

produced to the Independent Counsel, and that the "comparison showed that the two packages

were identical, he concluded that the problem "had not infected prior document product."  (Aug.

28 Tr. 85, 113.)  To Ruff, that was the end of the Mail2 problem.  (*Id.* at 136.)[22]

In hindsight, Ruff acknowledged that it was now apparent that his understanding of the

impact of the Mail2 problem upon prior document productions was "mistaken."  (*Id.* at 123.)  To

the extent that the White House Counsel's Office "failed to understand the true nature of this

---

been a problem with the way the search had been done for Monica Lewinsky and that as a result
of that problem, we had not – perhaps had not gotten [–] all of the documents that were
responsive" from the e-mail accounts of people who worked in the Office of Administration.  (*Id.*
at 199.)  Consequently, it did not then occur to Peterson that the problem could have affected the
present case.  (*Id.* at 203-04.)  Indeed, she was not assigned to work on this case until December
1998, almost six months later.  (*Id.* at 177.)  Even at that time Peterson had "no reason to
believe" that the Lewinsky incident "had any connection whatsoever to the *Alexander* case, and
we had done no e-mail search for the *Alexander* case."  (*Id.* at 206-07.)

[22] Lindsay, for his part, later learned from someone in the White House Counsel's Office
that the e-mails gathered in the search he had requested matched up "100 percent" with what had
already been produced to the Independent Counsel.  (Aug. 23 Tr. 145.)  Lindsay understood from
later conversations with attorneys in the Counsel's Office that "they believed that the concern
[he] raised did not have implications on document productions."  (Aug. 23 Tr. 194.)  Lindsay
testified that he assumed that the e-mails must have been located on the hard drives of the
individuals whose accounts were searched, so that the Mail2 problem had not affected the
production.  (*Id.*)  Lindsay claims that this was the "rational explanation" for what must have
happened.  (*Id.*)  This head-in-the-sand approach did not serve the White House well.

problem for any reason," he, as the head of that office, took responsibility for it. (*Id.*)  He assured the Court, however, that "if there had been any sense on my part or the part of any of the members of my staff that, in fact, there was a problem that persisted or that infected our prior productions, we would have done something about it."  (*Id.* at 124.)  The Court credits Ruff's belief as sincere, but concludes that Ruff's deputy (Mills) failed miserably in her follow-up.

      **(e)**      **The Insight Magazine article**

      Shortly after the Mail2 problem had been fixed prospectively, plaintiffs' counsel sent a letter to DOJ attaching an article dated December 28, 1998, from Insight Magazine.[23]  (Pl. Ex. 20.)  The article addressed two subjects.  First, it alleged that extensive, previously undisclosed telephone billing records were in the Old Executive Office Building.  Second, the article stated that a routine computer repair job at the White House had resulted in a "blockage" of about 100,000 e-mails, and that a project – called "Project X" – was underway to restore them.  The article made no reference to "Mail2," nor suggested that any e-mail was unavailable for searching.  (*Id.*)

      On December 15, 1998, plaintiffs' counsel brought the Insight article to the Court's attention during a hearing to determine the amount of time defendants would be allotted to cross-examine Linda Tripp.[24]  (*See* Dec. 15, 1998 Tr. 12 (transcript of status hearing); Aug. 28 Tr. 170.)  Plaintiffs' counsel described the import of the article as confirming Tripp's testimony that

---

    [23] The letter attaching the December 28, 1998 article was dated December 8, 1998. According to plaintiffs' counsel, Insight Magazine is distributed publicly several weeks in advance of its stated publication date.  (Aug. 3 Tr. 164; Aug. 23 Tr. 115.)

    [24] Representatives of the Office of Independent Counsel were also present for this hearing.  (*See* Dec. 15, 1998 Tr. 2, 35 (transcript of status hearing).)

a "big brother" computer system existed at the White House. "[T]hey never erased anything[;] . . . there is a backup email system." (Dec. 15 Tr. 12-13.)

DOJ counsel for EOP, Elizabeth Shapiro ("Shapiro"), in response to a question from the Court, stated that she was not then in a position to provide a response to the allegations in the Insight article. (Dec. 15 Tr. 34.) She stressed, however, as counsel for EOP had done many times in the past, that the parties had not yet reached agreement as to the parameters of any e-mail search. (*Id.*) In addition, counsel for EOP requested an opportunity to respond to the Insight article, after counsel had the opportunity to look into the allegations. (*Id.* at 45.)

Subsequent to the December 15, 1998 hearing, DOJ counsel for EOP did, in fact, make inquiries to the White House regarding the Insight article. As Peterson testified: "[T]he Justice Department made inquiries as to whether or not there was any truth to this article, and I did my best to find out whether there was." (Aug. 28 Tr. 180.)

While Peterson could not remember the DOJ lawyer with whom she spoke about the Insight article, and while the focus in her mind was the article's allegation regarding telephone billing records, she was positive that she had conversations with DOJ counsel regarding the article. (Aug. 28 Tr. 180-81.) With respect to the e-mail portion of the article, Peterson could not recount the specific conversation. (*Id.*) Nevertheless, she "cannot imagine that I was not asked about the e-mail question as well," (*id.* at 183), and suspects that she conveyed to DOJ counsel the extent of her contemporaneous knowledge of the subject: that there had been "a small problem that appeared to exist with respect to the Lewinsky search that turned out not to be a

problem."[25]  (*Id.* at 184.)  Shapiro subsequently confirmed to the Court that she was the DOJ

attorney who brought the Insight article to Peterson's attention and discussed the entire article

with her.  (Oct. 10 Tr. 99-101.)

With respect to the allegation in the article that additional telephone records resided in the

basement of the Old Executive Office Building, Peterson advised that, after consulting with Hall,

she was assured that the allegations were untrue.  (*Id.* at 100.)  With respect to the e-mail portion

of the article, Peterson reported that "there had been some issue relating to the Lewinsky matter,

that it had been fixed."  (*Id.*)  Because the telephone record allegations proved to be incorrect,

because the Lewinsky matter had been deemed irrelevant to the case, because counsel understood

that whatever "nonissue" had occurred with respect to the Lewinsky production had been fixed,

and because, in any event, no ARMS search for e-mails had yet been performed in the case, DOJ

counsel for EOP did not feel it necessary to respond to the Insight article or to pursue the matter

further.[26]  (*Id.* at 100-01.)  This, of course, turns out to be another point where much grief could

have been spared if a more thorough inquiry had been made by DOJ and White House counsel.

Another opportunity was squandered.  It is understandable to the Court, because plaintiffs'

overblown rhetoric over time tends to dull the senses of even the most competent opposing

counsel.  And once again, the Court finds that this failure to adequately investigate was simple

error, not part of some grand conspiracy to deprive plaintiffs of their rights.

---

[25] Peterson learned of the Mail2 problem only when it became public knowledge in the year 2000.  (Aug. 28 Tr. 174, 176.)

[26] Plaintiffs' letter of December 8, 1998 had also represented that plaintiffs would be filing a motion asking for appropriate relief.  That motion was never filed (at least until February 2000).  (Pl. Ex. 20.)

### (f)    Restoration of the unarchived e-mail

Once the Mail2 problem had been fixed prospectively, the backup tapes ordered preserved, and the White House Counsel's Office advised of the problem,[27] restoration from the backup tapes of the e-mail affected by the Mail2 problem – while necessary – was not the top priority within OA.  (Aug. 23 Tr. 153, 159, 173; Sept. 22 Tr. 82-83.)  Rather OA faced a "Y2K imperative."  (Sept. 22 Tr. 69, 96-95; Aug. 23 Tr. 153, 159, 173.)  Simply put, it was deemed essential for OA to bring all EOP systems into Y2K compliance or possibly face catastrophic system failures.  (Sept. 22 Tr. 95.)

Bringing all of EOP's computer systems into Y2K compliance and embarking upon a sizeable e-mail reconstruction project were both expensive and resource-intensive propositions.  (Sept. 22 Tr. 69, 70, 83.)  EOP's information technology infrastructure was antiquated, (Aug. 23 Tr. 152-53), and at the time in question, IS&T's human and fiscal resources were already stretched thin.  Under these circumstances, Lindsay was advised by the members of OA's technical staff that attempting to undertake the Mail2 reconstruction project at the same time as the Y2K effort would place the success of the Y2K program, which was already behind schedule, at substantial risk.  In addition, even if funding for the Mail2 project was forthcoming, management was advised that OA did not have the capacity to handle both projects.[28]  (Sept. 22

---

[27] By this time, the White House Counsel's Office had informed Lindsay that the Mail2 problem had not affected subpoena compliance.  (Aug. 23 Tr. 145.)  Lindsay had passed that information on to Apuzzo.  (Sept. 22 Tr. 50-51.)

[28] It was suggested that OA use funds earmarked for *Armstrong* compliance to fix the Mail2 problem.  (Aug. 17 Tr. 53.)  While OA considered that possibility, OA ultimately decided that it could not use those funds because they were specifically appropriated, and were not meant to fix problems with OA's normal operating system.  (Aug. 16 Tr. 192-93; Aug. 17 Tr. 54.)  Moreover, the Chairman of the Appropriations Subcommittee on Treasury, Postal Service, and

Tr. 82-83.)

Given the urgency of Y2K, therefore, Lindsay did not request funding for the Mail2

reconstruction when he testified in March 1999 before the congressional committee responsible

for EOP appropriations.  (Aug. 23 Tr. 14-15, 152-53; Sept. 22 Tr. 83; Aug. 17 Tr. 69.)  While

OA evaluated the issue,[29] it decided, for strategic reasons, that it needed to push as hard as

possible to receive from Congress the maximum amount of funds to support the Y2K effort.

(Aug. 23 Tr. 153.)  Nevertheless, though it was not the subject of his testimony, Lindsay did

inform committee staff and the chairman about the instability of EOP's systems, and the potential

to lose information.  (Aug. 23 Tr. 154-55.)

To the computer technicians working within OA, it appeared that their concerns about a

retrospective fix of the Mail2 problem were going unheeded.  Barry, for example, sent a number

of e-mails expressing his concerns about the Mail2 problem.  (*See*, *e.g.*, Pl. Ex. 9-53; Aug. 22 Tr.

105; Pl. Ex. 9-37; Pl. Ex. 24-4484; Aug. 18 Tr. 126, 172; Pl. Ex. 39-2804, 2798.)  These

technicians, however, were not involved in, or privy to, the broader policy considerations of

EOP, the strategic considerations that went into the appropriations process, (Aug. 16 Tr. 17-18),

or the information that had come back from the White House Counsel's Office, (Aug. 15 Tr. 10-

11).  For Lindsay's part, to the extent he was made aware of the technical staff's concerns second

---

General Government wrote Lindsay a letter on April 27, 2000, stating that *Armstrong* money
should not be used to fund the Mail2 reconstruction.  (Pl. Ex. 9-145.)

[29] During February 1999, Karl Heissner, who was the Branch Chief of Systems
Integration Development in IS&T then responsible for Mail2 reconstruction, (Aug. 15 Tr. 137,
174-75), was asked to provide information about the Mail2 problem for Mark Lindsay to use in
his fiscal year 2000 appropriations testimony, (*id.* at 122-26; Aug. 16 Tr. 10).  Ultimately, this
information was not included in the briefing book – which was prepared for Lindsay's benefit –
because Lindsay was already familiar with the issue.  (Aug. 23 Tr. 157-58.)

hand, he testified that he understood them only to involve an archival "reconstruction issue," and not the completeness of searches performed on ARMS.  (Aug. 23 Tr. 172-74, 200.)

6.   **Plaintiffs' Second Request for Production of Documents and the July 1999 Barry Declaration**

On October 27, 1998, plaintiffs served their Second Set of Requests for the Production of Documents ("Second Set") on the EOP.  Request No. 28, as originally submitted, sought "[a]ll e-mail correspondence to or from Craig Livingstone, Anthony Marceca, Hillary Rodham Clinton, Bernard Nussbaum, or William Kennedy <u>recovered in previous e-mail searches</u>, as described by Daniel Barry at [various] pages . . . of his June 11, 1998 deposition . . . ."  (Second Set 12 (emphasis added).)  EOP objected to this request as overbroad and irrelevant, and it reiterated its earlier offer "to perform searches of archived White House email within parameters as to date, users, and search terms reasonably calculated to lead to the discovery of relevant information without imposing an undue burden on EOP."  (EOP's Response to Second Set 22, 26, Jan. 14, 1999; *see also* Giles-Klayman Ltr.)

On March 26, 1999, plaintiffs filed a 135-page motion to compel concerning almost 100 of the requests in their second set of document requests.  After EOP brought to plaintiffs' attention the fact that they failed to comply with Local Rule 108(m), plaintiffs withdrew that motion, and the parties engaged in two days of negotiations.

EOP provided plaintiffs with supplemental information and documentation concerning Request No. 28 on April 22, 1999.  EOP stated that following the discovery of the FBI files matter in June 1996, a search was performed for e-mail to or from Craig Livingstone or Anthony Marceca during August 14-27, 1993.  That search yielded no results.  (Supp. Response to Second

34

Set 13-14, Apr. 30, 1999.)  EOP pointed out that this result was consistent with Barry's March 4,

1998 declaration, which explained that Livingstone did not have an e-mail account at the White

House.  (*Id.* at 14.)  Further, EOP stated it had never "otherwise performed a search for archived

e-mail related to the FBI files matter."  (*Id.*)  EOP refused, however, to provide discovery about

searches of White House e-mail undertaken in connection with other controversies, rejecting

plaintiffs' theory that these searches might yield e-mail relevant to this case.  (*Id.*)  EOP

reiterated its offer to perform a search on a reasonable number of relevant individuals' e-mail,

using a reasonable set of search terms.  (*Id.*)

Plaintiffs then filed, on June 14, 1999, a Motion to Compel Production of Documents

Regarding Second Request of EOP and for Further Relief as the Court Deems Just and Proper

("Mot. to Compel").  Plaintiffs argued that they needed responses to many of their "computer-

related requests" so they could "properly evaluate the estimates and opinions given by the EOP's

own computer experts regarding the burden the EOP alleges it would suffer if it had to search for

and produce electronic documents.  (Mot. to Compel 2.)  In addition, plaintiffs' motion

transformed Request No. 28 from a request for e-mail correspondence to or from five individuals

recovered in past searches into a first-time request for a "preliminary" search of e-mail to or from

thirty named individuals plus "all past and present members of Mrs. Clinton's staff, and all those

who worked at the OPS during the Clinton Administration."  (*Id.* at 27.)

On July 9, 1999, EOP filed an opposition to the motion to compel and attached another

declaration from Barry ("1999 Barry Decl.") of the same date.  The purpose of the declaration

was to respond to plaintiffs' search request by providing an estimate of the time and cost

associated with it.  (Aug. 28 Tr. 220, 245.)  Indeed, DOJ counsel informed Peterson in the White

House Counsel's Office shortly after plaintiffs filed their motion to compel that EOP would probably need a declaration from Barry "describ[ing] how difficult it would be to do the search that plaintiffs' counsel had asked for." (*Id.* at 220.)

On June 22, 1999, Peterson sent an e-mail to Barry conveying to him the contours of the search requested by plaintiffs and asking him to explain whether the search would be too burdensome. (Pl. Ex. 39-1051628-29; Aug. 28 Tr. 244-45.) The next day, Barry provided her with an estimate of the time and cost of conducting the search. (Pl. Ex. 39-1051630-31.) These estimates became the basis for the assertions regarding the time and cost of plaintiffs' requested e-mail search. (*Compare id. with* 1999 Barry Decl. ¶¶ 6-12.)

The 1999 Barry Declaration was initially drafted by DOJ counsel. (Aug. 18 Tr. 141; *see* Pl. Ex. 39-1051813.) DOJ counsel consulted with Barry several times in early July, both directly and through Peterson, in an effort to edit and finalize the document. (*See* Pl. Exs. 39-1051813-31, 39-1051834-54.)[30] Barry was shown the drafts, and he marked them up and faxed them back to either White House counsel or DOJ counsel. (Aug. 17 Tr. 145-46.) Among his edits were several changes to the wording of the first sentence of paragraph four, (*id.* at 148-50), which read, "Since July 14, 1994, e-mail within EOP has been archived weekly in an on-line format," (Pl. Ex. 39-1051633). Barry struck the phrase "weekly in an on-line format" and substituted "in the EOP Automated Records Management System (ARMS)." (*Id.*; Aug. 17 Tr. 148-50.) These changes were later incorporated into the declaration. (Aug. 17 Tr. 159-60; *see* 1999 Barry Decl. ¶ 4.)

---

[30] DOJ counsel Allison Giles told Peterson that Barry should also "review paragraphs 11-14 of [his March 1998] declaration carefully to ensure that we're consistent and accurate about what we say regarding searching on-line e-mail." (Pl. Ex. 39-1051813.)

In its final form, paragraph four of the declaration stated:

> Since July 14, 1994, e-mail within the EOP system administered by the Office of
> Administration has been archived in the EOP Automated Records Management System
> (ARMS).  With this current system, this e-mail is susceptible to being word-searched, for
> a single character string (e.g., "FBI" or "FBI files") or a multiple character string ("and"
> and "or" searches) found on any one line of text.

(1999 Barry Decl. ¶ 4.)  Barry viewed this statement in paragraph four as "essentially the same"

as the statement he had made in paragraph eleven of his earlier (March 4, 1998) declaration.

(Aug. 18 Tr. 144.)  He expressed his understanding of the earlier statement – with genuine

incredulity that it could be interpreted differently from the way he intended – as follows:

> [Paragraph eleven] defines what ARMS does.  ARMS archives e-mail.  That's what it
> does.  That what it says it does.
>
> So how can it be false, if that's what ARMS does?  It doesn't to my knowledge say that
> ARMS archives all e-mail within the EOP.  I wouldn't have signed it.  I wouldn't have
> signed it today.  I wouldn't sign it in '93.  I wouldn't sign it anywhere in my career at
> EOP.

(Aug. 3 Tr. 150.)  Similarly Barry understood paragraph four of the 1999 declaration to be no

more than "an introductory paragraph saying what ARMS has been doing for the last two years,

three years." (Aug. 17 Tr. 165.)  It was a general "introduction to ARMS." (*Id.* at 149.)

From Barry's technical perspective, the fact that the Mail2 problem involved Lotus Notes

e-mail and not All-in-One e-mail, (Aug. 18 Tr. 69), and the fact that there was nothing inaccurate

about the general representation that ARMS has been archiving e-mail since July 14, 1994,

meant there was no reason for him to raise the Mail2 problem with the lawyers with whom he

worked, (Aug. 21 Tr. 30; Aug. 22 Tr. 106-07; Aug. 18 Tr. 165).  From his conversations with

counsel, Barry understood the purpose of the 1999 declaration to be an update on the status of the

All-in-One e-mail reconstruction process, (Aug. 22 Tr. 105-07), and because "the All-in-[One] e-

mail reconstruction project was not affected by th[e] [Mail2] problem," (*id.* at 100), he did not see how the Mail2 problem was relevant to the declaration, (*id.* at 107).[31]

With no knowledge of the Mail2 problem, and based on Barry's declaration, EOP's opposition brief mistakenly represented that "<u>all</u> backed-up e-mail in the White House Office from November 1992 to the present, with the exception of two months, has now been restored and is capable of being searched."  (EOP Opp. 30 (emphasis added).)  Counsel did not perceive this error at the time.  Barry had not informed them of the Mail2 problem, (Aug. 21 Tr. 30), and although he was intimately involved in the drafting of his declaration, Barry did not review EOP's opposition brief, (*id.* at 18-19).[32]

### 7.   **February 2000 and Thereafter**

The first time that plaintiffs made allegations about the Mail2 problem was on February 19, 2000, when they submitted the Third Declaration of Sheryl Hall with their Emergency Motion of the same date.[33]  That motion identified persons with knowledge about an "apparent"

---

[31] Peterson was also unaware of any possible confusion which the paragraph might later engender.  Peterson depended upon Barry to inform her "if there was anything in [the declaration] that was inaccurate."  (Aug. 28 Tr. 222, 229, 240.)  Barry did not, however, advise her of the Mail2 problem.  (*Id.* at 248; Aug. 22 Tr. 106-07.)  Nor did anyone else.  (Aug. 28 Tr. 248.)  Consequently, Peterson – who was fully cognizant of her "responsibility to work with the Justice Department to make certain that [EOP's] representations to the Court were accurate," (*id.* at 229) – had no basis for perceiving a potential ambiguity in paragraph four of the 1999 Barry Declaration or the statements in EOP's opposition brief based upon it.  She did not believe that "there was anything inaccurate in his declaration."  (*Id.* at 231.)

[32] The Court did not rule on Plaintiffs' Motion to Compel until June 5, 2000, after the Mail2 problem became public knowledge, after criminal inquiries were initiated, and after the Civil Division was asked to stay its hand.  (*See* Mem. Op. of June 5, 2000.)

[33] Although Hall had filed two previous declarations since leaving the White House in September 1999, neither of them mentioned the Mail2 matter.  (*See* Hall Decl. (Sept. 15, 1999), Ex. 3 to Pl. Surreply to Def. Clinton's Cross-Motion for Protective Order (Sept. 15, 1999);

e-mail coverup, except for the names of the NG contractors, which plaintiffs stated were filed under seal.[34]  An additional declaration by Lambuth was filed under seal a few days later.[35]

EOP began looking into Hall's allegations so it could respond to plaintiffs' request for an evidentiary hearing.  On March 6, 2000, EOP explained that it could not meaningfully address plaintiffs' allegations so long as government counsel could not share the names of the NG employees or the sealed declaration with persons in and outside EOP who could speak to the allegations.[36]  Because EOP was interested in promptly investigating this matter, it requested that the Court expedite its consideration of plaintiffs' request to keep certain information under seal and EOP's opposition to that request.

On March 10, 2000, the Court ordered the names of the NG employees and other information unsealed.  (Orders of Mar. 10, 2000; Mar. 10 Tr. 13.)  The Court also granted EOP additional time, until March 24, 2000, to respond to plaintiffs' motion for an evidentiary hearing and said that it would consider further motions for additional time.  (Mar. 10 Tr. 21; Order of Mar. 13, 2000.)

---

Second Hall Decl. (Dec. 7, 1999), Ex. to Pl. Mot. for Leave to Supp. Record (Dec. 7, 1998); July 31 Tr. 175.)

[34] (Feb. 19 Emergency Mot. 7; Pl. Mot. to File Under Seal Supp. to Emergency Mot. to Supp. Pl. Motion to Compel, etc., Feb. 23, 2000.)

[35] (Second Supp. to Emergency Mot. to Supp. Pl. Mot. to Compel, etc., Feb. 25, 2000.) Another declaration (Hall's fourth) was subsequently filed under seal on March 7, 2000.  That declaration dealt largely with hard drives but also touched on the Mail2 matter.  (Pl. Mot. for Leave to File Emergency Mot. Under Seal (with accompanying motion for *ex parte* conference and declaration, Mar. 7, 2000.)

[36] *(See* EOP's Opp. to Pl. Reqs. to Restrict Discl. of the First and Second Supps. to Pl. Mot. for Evidentiary Hrg. 5, Mar. 6, 2000.)

At a hearing on March 10, 2000, EOP counsel provided the Court with a very preliminary summary of the Mail2 problem:

> What happened here is that from 1996 to 1998, due to a programming error, an email server within the EOP was not forwarding to the automated records management system certain email for purposes of archiving these email in a word searchable format. The White House's investigation into this entire matter, in all of its dimensions, is very preliminary.

(Mar. 10 Tr. 11.)  The Court stated that it was "going to give the government an opportunity to fully explore those matters and place them in the proper perspective before me." (*Id.* at 34.)

Prior to March 24, 2000, when EOP's response to plaintiffs' request for an evidentiary hearing was due, the Campaign Financing Task Force of the Criminal Division of DOJ requested that the Civil Division refrain from any further investigation because of the Criminal Division's investigation of the same matter.[37]  The Office of Independent Counsel joined in that request. The Civil Division notified the Court of the Criminal Division's request on March 23, 2000. (*See* Emergency Mot. to Supp. Pl. Mot. to Compel and Req. for Evidentiary Hrg. (Feb. 19, 2000).)  EOP also informed the Court that the Civil Division attorneys had initiated a factual inquiry into this matter but had suspended the inquiry at the request of the Task Force.[38]  The Court temporarily held plaintiffs' motion for an evidentiary hearing in abeyance.  (*See* Order of June 5, 2000, at 14; Order of July 10, 2000, at 10 n.5.)

---

[37] *(See* EOP's Mot. to Postpone the Court's Consideration of Pl. Req. for an Evidentiary Hrg., Mar. 23, 2000.)

[38] (Mar. 24 Tr. 4.  *See also* Decl. of James Gilligan, Aug. 4, 2000, Ex. to DOJ Mem. Opp. to Pl. Oral Mot. to Compel, Aug. 7, 2000 (discussing the Civil Division's scheduling and interviewing of witnesses).)  Contrary to Gallant's testimony, Gilligan spoke briefly to her in mid-March, to schedule an interview for March 21, 2000, in Chantilly, Virginia.  (*Id.* ¶¶ 2-3.) Because of the criminal investigations, however, Gilligan was compelled to cancel the interview. (*Id.* ¶¶ 4-5.)

The Court subsequently held a series of *in camera*, *ex parte* conferences with the Task

Force about the ongoing investigation.  (*See* July 20, 2000 Tr. 21.)  On July 20, 2000, the Court

announced that it had been advised the day before, at 5:00 P.M., by the Criminal Division, that

further inquiry by the Civil Division and the Court could recommence without threatening the

integrity of the criminal investigation.  (*Id.*)  The Court then immediately granted plaintiffs'

motion for an evidentiary hearing (pending since February 19, 2000), and scheduled the hearing

to commence on July 31, 2000.  The Civil Division on behalf of EOP never had the opportunity

to complete its inquiry into plaintiffs' allegations.  In fact, EOP never filed a response to

plaintiffs' motion for an evidentiary hearing, because EOP had sought and received a stay from

the Court, which was lifted at the same time that the Court granted plaintiffs' motion.

The fact that the Civil Division's inquiry was halted at the request of the Criminal

Division did not delay the search for relevant e-mail.[39]  While that investigation was ongoing,

---

[39] Hall's Second Declaration, dated December 7, 1999, alleged an overarching strategy by the EOP and its lawyers to "stall" this litigation.  Hall claimed that Peterson told her about this supposed strategy in a meeting.  (Second Hall Decl., Ex. to Pl. Mot. for Leave to Supp. the Record (Dec. 7, 1999).)  The declaration did not name anyone else who was present at the meeting when this conversation between Peterson and Hall allegedly occurred, although plaintiffs' counsel represented to the Court that DOJ counsel Shapiro also attended that meeting.  (*See* Mar. 24 Tr. 17.)

On April 19, 2000, Peterson, Shapiro, and DOJ counsel Allison Giles submitted declarations on this issue, stating that they, along with EOP employee Al Nagy, were present at the meeting to which Hall was referring, that Peterson had made no such statement about stalling the litigation, and that there was no such strategy.  After these declarations were filed, plaintiffs submitted yet another declaration from Hall, her fifth, dated May 18, 2000, to provide "a more complete account of this conversation with Ms. Peterson."  The fifth Hall declaration, like the second, did not identify anyone else who was present at the meeting to which Hall had referred.

It was only in Court, on July 31, 2000, that Hall stated for the first time that Nagy, Shapiro, and Giles were also present during the meeting with Peterson.  (July 31 Tr. 83.)  Hall also stated for the first time that Peterson had made the alleged stalling comment in a "low" voice to Hall alone, near Peterson's desk, and apparently out of earshot of the other meeting participants.  (*Id.* at 86.)  Hall acknowledged that she had left these details out of her two

DOJ reiterated its offer to undertake an e-mail search, (*see* Mar. 24, 2000 Tr. 45), and the parties briefed what terms should be used in the search for ARMS and non-ARMS e-mail, with the Court issuing rulings on June 5, 2000 and July 31, 2000.

EOP has now complied with all the Court's orders with regard to searching ARMS and non-ARMS e-mail.[40]

## **DISCUSSION**

While the evidence shows that there were internal miscommunications and misunderstandings about the nature and implications of the Mail2 problem within OA, and among OA, the White House Counsel's Office, and DOJ counsel, and that the problem clearly could have been handled better than it was, the record is barren of evidence of intentional wrongdoing on the part of EOP or its counsel.

In various submissions and oral presentations during this proceeding, plaintiffs have cited 28 U.S.C. section 1927 ("Section 1927") and the Court's inherent powers as potential bases for the imposition of sanctions against EOP and its counsel. Under Section 1927, "[a]ny attorney or

---

declarations. (*Id.* at 178-79.)
    The Court finds Peterson's testimony to be truthful, credible, and consistent with the weight of the evidence, and finds no credible evidence that there was a plan to "stall" this case until the President left office.

[40] *(See* Supp. Discovery Resp. by EOP, July 26, 2000; Supp. Resp. by EOP re: ARMS Email, Aug. 25, 2000; Supp. Discovery Resp. by EOP re: Haas "Zip" Disk, Archived Hard Drives, and Non-ARMS E-mail, Aug. 30, 2000; Supp. Discovery Resp. by EOP re: Non-Records Managed Emails, Sept. 14, 2000). See also the Court's Order of December 17, 2002, regarding the Tape Restoration Project search, and EOP's Supplemental Discovery Response, filed February 6, 2003, indicating that the complete Tape Restoration Project database had been searched pursuant to the Court's December 17, 2002, Order, and producing the one document found – a document previously produced on August 29, 2000, pursuant to the Court's Orders of July 10, 2000, and July 31, 2000.

other person admitted to conduct cases in any court of the United States or any Territory thereof

who so multiplies the proceedings in any case unreasonably and vexatiously may be required by

the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred

because of such conduct." 28 U.S.C. § 1927 (2008). And, in the exercise of its inherent

authority, a court may assess attorneys' fees and expenses against a party for certain abuses of its

processes. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991). Plaintiffs have labored

unsuccessfully to establish this sort of bad faith, or deliberate disregard of a duty owed to this

Court, that might ordinarily justify an award of sanctions under one of these legal theories.

## I.      Unavailability of Sanctions Against EOP under Either Theory

But quite apart from such factual questions, as a matter of law, neither Section 1927 nor

the Court's inherent power can support an award of monetary sanctions against EOP. Section

1927 applies only to counsel in litigation, not to parties. Furthermore, sovereign immunity

precludes an award of monetary sanctions against an agency of the federal government, whether

premised on Section 1927 or a court's inherent power.

### A.      Section 1927 Sanctions and Parties

By its own terms, an award under Section 1927 may be made "only against attorneys or

other persons authorized to practice before the courts." *Schlaifer Nance & Co. v. Estate of

Warhol*, 194 F.3d 323, 336 (2d Cir. 1999).[41] The statute, entitled, "[c]ounsel's liability for

excessive costs," does not provide for the imposition of sanctions against parties. *See* 28 U.S.C.

---

[41] *See also Bergeron v. Northwest Publs.*, No. 3-94-1124, 1996 U.S. Dist. LEXIS 15511,
at *27 (D. Minn. Jan. 12, 1996) (Section 1927 authorized sanctions "only against the attorney");
*Kenna v. Dep't of Justice*, 128 F.R.D. 172, 176 (D.N.H. 1989) (same); *Nasco, Inc. v. Calcasieu
TV & Radio*, 124 F.R.D. 120, 139 (W.D. La. 1989) (same).

§ 1927 (2008) (emphasis added).[42]

The Court stated during the present proceeding that it is not contemplating sanctions against any individual, attorney or otherwise.  (Aug. 25 Tr. 13.)  The Court also appropriately observed that before counsel or other individuals could be made personally liable for sanctions, they would first have to be given "specific notice" and "an opportunity to be heard."  (*Id.*)  Because such notice has never been provided, indeed, because the Court has consistently advised EOP and its counsel that it is <u>not</u> considering sanctions against individual attorneys, no sanction can be levied here under Section 1927 as a matter of law.  *See, e.g., Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96-97 (2d Cir. 1997) (holding that "a sanctioned attorney must receive specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on that matter"); *Baulch v. Johns*, 70 F.3d 813, 817 (5th Cir. 1995) ("§1927 sanctions should not be assessed without fair notice and without giving the attorney an opportunity to respond").

### B.      Monetary Sanctions and Sovereign Immunity

Even if Section 1927 authorized awards of sanctions against parties generally, it still could not be a basis to assess monetary sanctions against EOP, or any other establishment of the federal government.  Sovereign immunity bars awards of attorneys' fees and costs against the government, except insofar as that immunity has been waived.  *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685 (1983); *Haase v. Sessions*, 893 F.2d 370, 373 (D.C. Cir. 1990) ("Attorney's fees and costs may be awarded against the United States only when, under a particular statute, the

---

[42]   *See also Maguire Oil Co. v. City of Houston*, 143 F.3d 205, 208 (5th Cir. 1998) (by its own terms, statutory remedy is available only against attorneys, not parties); *Damiani v. Adams*, 657 F. Supp. 1409, 1417 (S.D. Cal. 1987) (same).

government has waived its sovereign immunity."). *See also United States v. Horn*, 29 F.3d 754, 761 (1st Cir. 1994).   To be effective, "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 192 (1996). *See also Dep't of the Army v. FLRA*, 56 F.3d 273, 275 (D.C. Cir. 1995) (officers of the United States have no power to waive federal sovereign immunity absent express provision by Congress).   Therefore, provisions authorizing sanctions generally "do[] not automatically waive sovereign immunity, and thus do[] not apply, without more, to fee awards against the government." *In re Graham*, 981 F.2d 1135, 1139-40 (10th Cir. 1992).

For example, notwithstanding the broad powers conferred upon the courts by the contempt statute, 18 U.S.C. section 401, courts have held that it does not qualify as a waiver of sovereign immunity because it contains no explicit, unequivocal language allowing the government to be sued. *Horn*, 29 F.3d at 763; *United States v. Waksberg*, 881 F. Supp. 36, 40 (D.D.C. 1995) (Green J.), *vacated on other grounds*, 112 F.3d 1225 (D.C. Cir. 1997).   Similarly the Tenth Circuit held in *In re Graham* that the sanctions provision of the bankruptcy statute does not permit the imposition of attorneys' fees against the government.   981 F.2d at 1139-40.[43] Thus, as that court observed, even supposing Section 1927 could be read to "encompass[] awards against the party," which it cannot, there being no explicit, unequivocal language therein that authorizes awards of attorneys' fees against the government, "[section 1927] would still require

---

[43] *See also In re Turner*, 14 F.3d 637, 640 (D.C. Cir. 1994) ("even where a fee award is otherwise authorized, the Government is shielded by sovereign immunity from attorney's fee liability except to the extent it has [explicitly] waived its immunity" (internal quotation and citation omitted)). *Cf. Dorsey v. Dep't of Labor*, 41 F.3d 1551, 1555 (D.C. Cir. 1994) (a right of action for damages against private parties does not mean that damages may also be recovered against the government, which stands on a different footing when it comes to monetary relief).

45

some independent waiver of sovereign immunity in order to apply it to the United States." *Id.* at 1140.[44]

The result is the same under the Court's inherent power to sanction misconduct. As a general matter, it is unassailable that a court's inherent authority includes the power to assess attorneys' fees or other monetary fines against either parties or their attorneys. *Chambers*, 501 U.S. at 49-50. *Accord Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-67 (1980); *Horn*, 29 F.3d at 760. Absent a waiver of sovereign immunity, however, that power does not encompass the authority to impose monetary sanctions against the government. *See Horn*, 29 F.3d at 764-67; *Waksberg*, 881 F. Supp. at 41. "The right to recover attorneys' fees from the United States depends on whether Congress has waived sovereign immunity." *In re North*, 62 F.3d 1434, 1436 (D.C. Cir. 1994). As Judge Green explained in *Waksberg*, "[s]overeign immunity can be curtailed only pursuant to the exercise of legislative[,] not judicial[,] power." 881 F. Supp. at 41. *See also Presidential Gardens v. United States ex rel. Sec'y of HUD*, 175 F.3d 132, 140 (D.C. Cir. 1999) ("the federal government's sovereign immunity may only be waived by Congressional enactment"); *Dep't of the Army v. FLRA*, 56 F.3d at 275 (only express provision of Congress can waive sovereign immunity); *Horn*, 29 F.3d at 764 ("Congress, not the courts, is the government's

---

[44] The Equal Access to Justice Act ("EAJA"), 28 U.S.C. section 2412(b), (d) does not supply the needed waiver. Both subsections 2412(b) and 2412(d) provide that a court is authorized to award attorneys' fees and costs, but only under circumstances not applicable here, and only to a "prevailing party." *Spencer v. NLRB*, 712 F.2d 539, 543-46 (D.C. Cir. 1983). *See also Beach v. Smith*, 743 F.2d 1303, 1306-07 (9th Cir. 1984) (discussing "prevailing party" requirement). A "prevailing party" is one that obtains "'actual relief on the merits of [its] claim [that] materially alters the legal relationship between the parties.'" *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 594 (D.C. Cir. 1996) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111 (1992) (emphasis added). Because plaintiffs have not obtained "actual relief on the merits" of their Privacy Act claims against EOP, they are not "prevailing part[ies]" even eligible, much less entitled, to an award of attorneys' fees authorized by the EAJA.

authorized representative for purposes of waiving sovereign immunity"); *Resolution Trust Corp. v. Miramon*, 935 F. Supp. 838, 841 (E.D. La. 1996) ("[o]nly Congress has the power to waive a federal agency's sovereign immunity").

The reason that a court cannot order a payment of money by the government without an act of Congress is as straightforward as it is fundamental: by the Constitution's explicit command, "'[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.'" *In re North*, 62 F.3d at 1435 (quoting U.S. Const. art. I, § 9, cl. 7). As a result, the constitutional text itself forbids a "court [to] authorize payment from the Treasury [absent] congressional authorization." *Id.* at 1436.

Thus, when it comes to monetary sanctions against the government, "the doctrine of sovereign immunity prevails over inherent judicial power." *Waksberg*, 881 F. Supp. at 41 (citing *Horn*, 29 F.3d at 764 ("if Congress has not waived the sovereign's immunity in a given context, the courts are obliged to honor that immunity")). Therefore, the Court cannot impose a monetary sanction against EOP, or any other agency of the government, absent an express statutory waiver of sovereign immunity by Congress permitting it to do so.[45]

## II.    Legal Standards for Sanctions Under Section 1927 and the Court's Inherent Power

Even assuming Section 1927 or the Court's inherent power authorized an award of monetary sanctions against a government agency, sanctions are a matter "not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *Trulis v. Barton*, 107 F.3d 685, 694 (9th Cir. 1995) (quotation marks and citations omitted).

---

[45] Of course, the Court has inherent authority to impose non-monetary sanctions against parties or their counsel for abuse of its processes. *See Chambers*, 501 U.S. at 44-45.

Well-defined legal principles govern this Court's exercise of its power under both Section 1927 and its inherent authority.

### A.      Section 1927

Under Section 1927, a court "may," but need not, tax (1) an "attorney or other person admitted to conduct cases" in federal court (2) who "multiplies the proceedings . . . unreasonably and vexatiously" (3) with "the excess costs, expenses and attorneys' fees" (4) "reasonably incurred" by an opposing party "because of such conduct." 28 U.S.C. § 1927 (2008). While it is settled that a finding of bad faith is essential to the imposition of sanctions under the inherent power, the District of Columbia Circuit "has not yet established whether the standard [for unreasonable and vexatious conduct under section 1927] should be 'recklessness' or the more stringent 'bad faith.'" *LaPrade v. Kidder Peabody & Co., Inc.*, 146 F.3d 899, 905 (D.C. Cir. 1998) (citing *United States v. Wallace*, 964 F.2d 1214, 1218-19 (D.C. Cir. 1992)). *See also Alexander v. FBI*, 192 F.R.D. 25, 31 (D.D.C. 2000) (Lamberth, J.).

Even assuming, for the sake of argument, that recklessness is the appropriate standard, Section 1927 may not be used as a "'catch-all' provision . . . for sanctioning any and all . . . conduct courts want to discourage." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997). Recklessness is a "high threshold . . . and in general requires <u>deliberate</u> action in the face of a <u>known</u> risk, the likelihood or impact of which the actor inexcusably underestimates or ignores." *Wallace*, 964 F.2d at 1219-20 (emphasis added) (internal citation omitted). Accordingly, even under a recklessness standard, the assessment of attorneys' fees and costs under Section 1927 would remain "'a power which the courts should exercise <u>only</u> in instances of a <u>serious and studied disregard for the orderly process of justice</u>.'" *Id.* at 1220 (quoting

48

*Overnite Transp. Co. v. Chi. Indus. Tire Co.*, 697 F.2d 789, 795 (7th Cir. 1983) (emphasis added)).[46]

By the same token, "an attorney who might be guilty of no more than a mistake in professional judgment" should not be penalized under Section 1927. *Baker Indus. v. Cerberus, Ltd.*, 764 F.2d 204, 209 (3d Cir. 1985). Thus, the courts are unanimous that unintended, inadvertent, or even negligent conduct will not support an assessment of fees and costs under Section 1927, no matter how "annoying" or frustrating to the trial judge it might be. *Wallace*, 964 F.2d at 1219, 1220. *See also Holmes v. City of Massillon*, 78 F.3d 1041, 1049 (6th Cir. 1996) (to justify Section 1927 sanction, "attorney's misconduct, while not required to have been carried out in bad faith, must amount to more than simple inadvertence or negligence that has frustrated the trial judge"); *FDIC v. Conner*, 20 F.3d 1376, 1384-85 (5th Cir. 1994) (where party's response to lower court's order was "careless and even negligent," vacating Section 1927 sanction absent finding that attorney's conduct was "vexatious").

Moreover, regardless of whether the applicable standard is bad faith or recklessness, a finding of "vexatiousness" under Section 1927, like a finding of litigation misconduct under a court's inherent power, must be supported by clear and convincing evidence. The punitive character of Section 1927 has been widely acknowledged by the federal courts. *E.g., Peterson*,

---

[46] Thus, in the only case where the District of Columbia Circuit has awarded Section 1927 sanctions based on a recklessness standard, counsel had refused, both in the trial court and at several turns on appeal, to identify the disputed facts that he contended required a trial of the case. *Reliance Ins. Co. v. Sweeney Corp., Md.*, 792 F.2d 1137, 1138-39 (D.C. Cir. 1986). This was the very sort of "repeated or singularly egregious" behavior required before Section 1927 may be employed. *Wallace*, 964 F.2d at 1220.

124 F.3d at 1395 (characterizing section 1927 as "penal in nature").[47]  Consistent with the recognized character of the statute, and the fundamentally penal nature of the sanction specified therein – attorneys' fees and costs[48] – courts hold that Section 1927 requires a "clear showing" that the responsible individual acted unreasonably and vexatiously before a sanction may be assessed.  *E.g.*, *Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996).[49]  There is no such evidence in this case.

### B.    Inherent Power

Federal courts are endowed with a wide array of inherent powers "to protect their integrity and prevent abuses of the judicial process."  *Shepherd v. ABC*, 62 F.3d 1469, 1474 (D.C. Cir. 1995) (citing *Chambers*, 501 U.S. at 46).  Yet precisely "[b]ecause of their very potency," *Chambers*, 501 U.S. at 44, and "[b]ecause [they] are shielded from direct democratic controls," a court's inherent powers "must be exercised with restraint and discretion."  *Roadway Express*, 447 U.S. at 764.

_____

[47] *See also Lee v. L.B. Sales, Inc.*, 177 F.3d 714, 718 (8th Cir. 1999) ("section 1927 is penal in nature"); *Browning v. Kramer*, 931 F.2d 340, 344 (5th Cir. 1991) ("awards under § 1927 [are] penal in nature"); *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226 (7th Cir. 1984) ("Section 1927 is clearly punitive").  *Cf. Williams Enters., Inc. v. Sherman R. Smoot Co.*, 938 F.2d 230, 237 (D.C. Cir. 1991) (warning that "we may penalize counsel for raising arguments so wholly without merit" under Section 1927).

[48] *See Shepherd v. ABC*, 62 F.3d 1469, 1478 (D.C. Cir. 1995) (observing that certain inherent power sanctions – "dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines" – are "fundamentally penal").

[49] *See also Orr v. Mfrs. Life Ins. Co. of N. Am.*, No. 3:98-CV-0165-D, 1998 U.S. Dist. LEXIS 14278, at *13 (N.D. Tex. Sept. 8, 1998) ("clear evidence"); *Dobkin v. Johns Hopkins Univ.*, No. HAR 93-2228, 1995 U.S. Dist. LEXIS 4458, at *6 (D. Md. Mar. 24, 1995) ("clear showing"); *Scott v. Dalkon Shield Claimants' Trust*, No. 85-1718, 1994 U.S. Dist. LEXIS 8939, at *3 (E.D. La. June 24, 1994) ("clear showing"); *Hunt v. Haysville State Bank*, No. 89-2481-O, 1991 U.S. Dist. LEXIS 11107, at *10 (D. Kan. July 2, 1991) ("clear showing").

The first restraint is that, to impose a sanction based on its inherent authority, the court must find some connection between the sanctioned conduct and a process of the court in the litigation before it. This principle arises from the limited purpose of inherent authority, which is to support the ability of courts "'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers*, 501 U.S. at 43 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)).

Thus, in affirming the sanctions imposed by the district court, the Supreme Court in *Chambers* found that the district court had not sanctioned the offending party for breach of contract (the underlying dispute on the merits), but only for the "sanctionable acts which occurred in connection with the proceedings in the trial Court." *Id.* at 54-55, 55 n.17 (quotation marks and citation omitted).[50] Accordingly, alleged misconduct by EOP or its counsel that does not bear on the Court's processes in this case is by its nature beyond the Court's inherent authority to sanction.[51]

Second, even when there is a nexus between the conduct at issue and some judicial process, before exercising its inherent power to award sanctions, "the court must make an explicit finding that [the target of the sanctions] acted in bad faith." *Alexander*, 192 F.R.D. at 31.

---

[50] *See also id.* at 74 (Kennedy, J., dissenting) ("[a] court's inherent authority extends only to remedy abuses of the judicial process"); *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir. 1976) ("The business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it" (emphasis added)).

[51] While this requirement that there be a connection to the pending litigation often is left unsaid (perhaps because of its obviousness), it is implied in various formulations of the inherent power. *See Shepherd*, 62 F.3d at 1474 (inherent power permits courts to "prevent abuses of the judicial process"); *Alexander*, 192 F.R.D. at 31 ("The court possesses the inherent power to monitor litigation closely and to sanction litigants for abusive practices.").

*See also Wallace*, 964 F.2d at 1219 ("it is settled that a finding of bad faith is required for sanctions under the court's inherent powers").  Thus alleged misconduct by EOP or its counsel that does not involve bad faith is likewise beyond the Court's inherent authority to sanction.

What is more, "for those inherent power sanctions that are fundamentally penal – dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines – [a] district court must find clear and convincing evidence of the predicate misconduct." *Shepherd*, 62 F.3d at 1478.  "[H]eightened certainty" is called for both to guard against the misguided imposition of sanctions that are "fundamentally punitive" and to reduce the risk of erroneously tarnishing a party's reputation with findings of bad faith "or some other quasi-criminal wrongdoing." *Id.* at 1476-78.

III.    **Application of Legal Standards to EOP's Conduct**

A.      **Alleged Concealment of the Mail2 Problem**

One clearly undisputed fact established is that the Mail2 problem arose because of a computer programming error by PRC, Inc., NG's predecessor.  It was not the result of any calculated act on EOP's part.  (Aug. 1 Tr. 72; Aug. 14 Tr. 103; Aug. 15 Tr. 125; Aug. 22 Tr. 28; Aug. 23 Tr. 200-01; Lambuth Decl. ¶ 3, Feb. 24, 2000.)  Moreover, the programming error itself did not cause any e-mails to be destroyed; it simply prevented them from being archived by ARMS.  (Aug. 3 Tr. 185, 194.)

While NG employees were threatened by OA officials with at least loss of employment, and perhaps, jail, if they disclosed the existence of the Mail2 problem, plaintiffs have not presented any evidence to explain why EOP would have attempted even temporarily to conceal the existence of the Mail2 problem from plaintiffs in this case or from this Court.  There is

52

certainly no logic to the notion that EOP might have feared the problem's disclosure to plaintiffs or to this Court.  From the time it was discovered until June 2000, no ARMS search had been conducted in this case, and there were no outstanding orders to perform such a search. Moreover, given the undisputed fact that the Mail2 problem persisted from August 1996 to November 1998, and affected messages sent from external systems, (*see* Pl. Ex. 116; Nov. 2 Tr. 60-61, 69), the chances are remote that these e-mails would have had anything to do with the FBI files matter, which occurred in 1993 and 1994.

This conclusion is buttressed by EOP's review of thousands of e-mails that had not been captured by ARMS as a result of the Mail2 problem and which were reconstructed as a result of this proceeding.  A copy of the <u>sole</u> e-mail arguably responsive to plaintiffs' court-approved discovery demand that EOP located has been provided to the Court, and it plainly has no material bearing on the underlying facts of this case.  There simply is no evidentiary basis for concluding that EOP has misled or defrauded the Court to prevent the disclosure of e-mails that did not enter ARMS as a result of the Mail2 problem.

Plaintiffs have alleged that, as part of an elaborate scheme to conceal the Mail2 problem from this Court, EOP submitted, and later failed to correct, false and misleading testimony by Daniel Barry.  But plaintiffs have presented no evidence that Barry, EOP, or its counsel <u>knowingly</u> submitted false testimony.

Barry's March 4, 1998 declaration states that "[s]ince July 14, 1994, e-mail within EOP has been archived weekly in an online format that is susceptible to being word-searched." (Barry Decl. ¶ 11, Mar. 4, 1998.)  Barry testified to the same effect in his June 11, 1998 deposition. (Barry Dep. 145.)  To the extent this testimony can logically be read to describe what ARMS

contains, and implicitly, to mean that ARMS contains "all" EOP e-mail created since July 1994,

it has proven to be untrue: due to the Mail2 problem, ARMS did not receive certain external e-

mails to the Mail2 server between August 1996 and November 1998.  But to the extent this

testimony is read as Barry testified he intended it to mean, (*see* Aug. 3 Tr. 150), as a description

of what ARMS does – which is to archive e-mail in an online word-searchable format – it is true.

Quite apart from the truth or falsity of Barry's testimony, however, plaintiffs have not

demonstrated by clear and convincing evidence that Barry, EOP, or EOP's counsel acted in bad

faith, with an intent to mislead this Court.   Nor have plaintiffs shown that Barry, EOP, or its

counsel acted in knowing and deliberate disregard of both the falsity of Barry's testimony and its

potential impact on the orderly progress of this case.  *See Wallace*, 964 F.2d at 1219-20.

The Mail2 problem was not discovered as a systemic problem by anyone until June 1998,

some three months after Barry's March 4, 1998 declaration was filed.  With respect to that

declaration, Barry, EOP, and EOP's counsel could not have acted with an intent to conceal, or in

knowing disregard of, a set of circumstances that they were completely unaware of at the relevant

time.

Plaintiffs have sought to alter this conclusion by noting that the errata sheet of July 11,

1998, prepared by Barry for the transcript of his June 11, 1998 deposition contained no

substantive changes to his deposition testimony, even though he had been made aware of the

Mail2 problem several days earlier, on July 6, 1998.  (*See* Aug. 3 Tr. 86; Pl. Ex. 47.)  They have

also noted that no amendment was made to Barry's March 4, 1998, declaration.

These facts alone cannot support a finding of litigation misconduct by EOP or its counsel.

First, Barry did not inform counsel who assisted him with his deposition, or his March 1998

declaration, about the Mail2 problem.  (Aug. 3 Tr. 146-47.)  Thus, counsel had no notice of any

reason to question the complete accuracy of Barry's testimony, either before or after the fact.

As for Barry himself, there is no reason to believe that he, a computer technician and

career civil servant whose job duties were and remain completely apolitical, had any improper

motive to conceal the existence of the Mail2 error.  Indeed, the record is replete with numerous e-

mails and other communications from Barry to his colleagues which, although acknowledging

that it was not his responsibility, nevertheless expressed concern about the Mail2 problem and

the need to take corrective action.  (*See*, *e.g.*, Pl. Exs. 9-37, 9-52, 24-4484.)  These persistent and

conscientious attempts to address the Mail2 issue cannot be squared with the notion that Barry

deliberately perjured himself, at great personal risk, to conceal it.

There is likewise no evidence that anyone at EOP instructed or forced Barry to conceal

the existence of the Mail2 problem.  In fact, Barry testified affirmatively that he never received

an instruction of that kind, or pressure to attest to facts that he believed to be false or misleading.

(Aug. 18 Tr. 29-30; Aug. 22 Tr. 109-10.)  Instead, the instructions he received (from counsel)

were to review his deposition transcript for substantive errors, and to make whatever changes

were needed to correct any mistakes in his testimony.  (Aug. 17 Tr. 74, 77.)[52]

EOP and its counsel would have had every reason to be forthcoming about the Mail2

problem had Barry raised it with them.  A central purpose of Barry's declarations and his

deposition was to support EOP's burdensomeness objections to plaintiffs' unrestricted demands

---

[52] Finding none, Barry faxed the pages of the deposition where he had noted a number of
transcription errors (such as spelling mistakes) to government counsel on July 8, 1998.  (Pl. Ex.
47.)  Counsel duly incorporated all of these corrections into the errata sheet prepared for Barry's
signature.  (Pl. Ex. 23.)

for searches of backed-up and archived e-mail.  If counsel working on this matter had been aware of the fact that certain post-July 1994 e-mails were available only on backup tapes, and could not be searched on ARMS, then EOP would have had every reason to make sure Barry included that information in his testimony.  Because of the exorbitant time and effort required to restore and search e-mails from backup tapes, as compared to the more straightforward process of retrieving them from ARMS, (Pl. Ex. 18 ¶¶ 6-11), that information would have fortified EOP's objections to plaintiffs' search requests.

But the reality is that Barry never mentioned the Mail2 problem to his counsel because it never occurred to him that it might have anything to do with his testimony.  (Aug. 22 Tr. 100.)  In his mind, there was simply no connection between them.  Viewing the matter from the perspective of someone trained in computer science, not the fine points of the law, Barry believed that his testimony had only to do with describing what ARMS <u>does</u>, (Aug. 3 Tr. 62, 150; Aug. 17 Tr. 108, 112; Barry Decl. ¶ 11 (Mar. 4, 1998); *see Alexander*, 188 F.R.D. at 117), which is to receive and store e-mails passed to it by other systems.  The Mail2 problem, in Barry's eyes, did not alter what ARMS does.

Barry testified that he was astonished to learn that his testimony had been taken to mean that "all" e-mails had been passed to ARMS since July 1994, (Aug. 3 Tr. 161-62), and had it occurred to him that his testimony might be read in that fashion, he would never have signed his declaration (or signed off on his deposition) as written, (*id.* at 159-60).  As Barry explained, neither he nor anyone else with his technical training and expertise would swear under oath that ARMS or any other computer database contained "all" the data that were meant for it because computer systems routinely experience "glitches" that can result in a loss of data.  (Aug. 3 Tr.

162; Aug. 22 Tr. 88.)

Further separating the Mail2 problem from the subject matter of Barry's testimony, at least in his mind, was the fact that the problem lay in the Lotus Notes system.  It did not reflect a problem with the operation of ARMS, or conducting searches on ARMS, which he viewed as the primary focus of his testimony.  It did not even bear upon the All-in-One e-mail system, the only other subject encompassed by his testimony (or so he understood, because of his prior experience and expertise with that system).  Therefore, even if the Mail2 error had crossed Barry's mind as he worked on his declarations and deposition, he testified that he would not have considered it relevant to his testimony.  That was all the more so because, to the extent of his understanding, Barry believed that the e-mails being sought for the purposes of the present case dated from 1993 and 1994.  (Aug. 21 Tr. 38; Pl. Ex. 40-2872.)  He had no reason to believe that "missing" e-mails sent by Lewinsky several years later would have any bearing on the facts that plaintiffs were trying to discover in this litigation.[53]

There is simply no evidence, clear and convincing or otherwise, to support plaintiffs'

---

[53] Plaintiffs have suggested that Barry and his counsel knew that his March 4, 1998 declaration was false when filed because of his discovery in January 1998 of the "anomaly" involving the e-mail conversation between Raines and Lewinsky.  But Barry testified that for the very reasons it never occurred to him that the Mail2 problem itself was relevant to his testimony, it likewise never crossed his mind that the anomaly was relevant, and so he never raised it with counsel.  (Aug. 22 Tr. 92.)  Barry explained that he had even less reason to make an issue of the anomaly than of the discovery of the Mail2 problem because he could not be sure whether the anomaly he observed in January 1998 – the apparent absence from ARMS of e-mails sent by Lewinsky to Raines – was an isolated occurrence or something systemic in nature.  He suspected that it was not systemic because he had already located a substantial number of inbound e-mails from Lewinsky during the course of the ARMS search he then had underway.  (Aug. 3 Tr. 69-70, 72; see Pl. Ex. 9-49.)  Thus, Barry testified that he had no reason to attach any greater significance to the anomaly than to any of the other numerous "glitches" that routinely occurred in EOP computer systems.

allegation that Barry, and therefore EOP or its counsel, consciously avoided reference to the

Mail2 problem in Barry's March 4, 1998 declaration, his June 1998 deposition, or his errata

sheet, either for the purpose of misleading this Court, or in deliberate disregard of a recognized

duty to bring the problem to the Court's attention.  Thus, this allegation cannot be the basis for

sanctions against EOP or its counsel.

### B.    Alleged Threats to NG Employees

Plaintiffs have established that NG employees charged with correcting the Mail2 problem

were threatened by EOP personnel with the loss of their jobs, and possibly imprisonment, if they

disclosed its existence.  This stands in stark contrast to most of plaintiffs' other claims of

obstruction of justice and abuse of process because plaintiffs did, in fact, present testimony

during this proceeding that threatening remarks were made.  But this evidence is not sufficiently

convincing of bad faith or intentional misconduct by EOP to provide a basis for the imposition of

punitive sanctions, *Shepherd*, 62 F.3d at 1476-78, and there is no evidence of the required nexus

between the alleged threats by EOP officials and this Court's processes.

Lambuth's testimony, that she relayed threats from Crabtree to her staff, (Aug. 1 Tr. 18-

19), conflicts with testimony by Haas, who testified that Crabtree threatened him and the other

NG employees directly during the meeting held in her office, (Aug. 15 Tr. 32-33).  Golas, in turn,

could recall only that she heard the word "jail" mentioned, but not who said it.  (Aug. 2 Tr. 164.)

Lambuth and Golas acknowledged that they heard Spriggs and Salim, the other two NG

employees who attended the meeting at which threatening remarks were allegedly made, testify

before Congress that they did not hear any threats about being fired, or going to jail.  (Aug. 1 Tr.

87; Aug. 2 Tr. 165.)  Gallant and Barry, who also worked on the Mail2 matter, were never

threatened with retaliation even though they both communicated widely and in writing about the problem.  (Aug. 1 Tr. 220-23; Aug. 22 Tr. 94-98.)  Lindsay unequivocally denied Lambuth's claim (which is unsupported by the testimony of any other witness) that he threatened her during a meeting she attended in the office of Paulette Cichon.  (Aug. 1 Tr. 25; Aug. 23 Tr. 37.)  Lambuth acknowledged that Cichon had given a statement to Congress that she did not hear Lindsay utter any threats during this meeting.  (Aug. 1 Tr. 92.)

Moreover, the NG personnel who testified about the meeting in Crabtree's office at which threats were allegedly made, including Lambuth, all agreed that they considered it reasonable of EOP to request that the Mail2 issue be treated as confidential until the nature and scope of the problem were better understood.  (Aug. 1 Tr. 79; Aug. 2 Tr. 167-68; Aug. 15 Tr. 25-29; Aug. 23 Tr. 23.)  Lambuth herself endorsed that request by turning to her staff one by one and pointedly asking if each employee had understood the request.  (Aug. 2 Tr. 167-68; Aug. 15 Tr. 30-32.)

In addition, Haas allowed that in retrospect, the NG employees had blown the whole matter out of proportion, and he felt "childish" about it.  (Aug. 15 Tr. 34-47.)  It is noteworthy that apparently, the NG employees did not even mention threats of going to jail, or being fired, when they met with in-house counsel in September 1998.  (Dec. 22 Tr. 62-65, 88-89, 151-53, 175-76 (testimony of NG attorneys that they did not hear of such allegations before the year 2000).)  In fact, Haas testified that after meeting with corporate counsel, and receiving further assurances from Hawkins, he simply forgot about the threats altogether.  (Aug. 14 Tr. 71, 74.)  None of this evidence can be reconciled with plaintiffs' contention that EOP officials intentionally threatened NG employees for the purpose of concealing the Mail2 problem from plaintiffs and this Court.

59

There is also no evidence that the threats allegedly made by Crabtree, a technical supervisor within IS&T, were authorized or endorsed by Lindsay or anyone else in a position of authority at EOP.  (*Cf.* Aug. 23 Tr. 36-37.)[54]  Gallant expressly scotched that notion when she testified on plaintiffs' behalf.  Upon learning that the NG employees believed they were not at liberty to discuss the Mail2 issue, she quickly countermanded any instructions to that effect and directed the NG personnel to meet with Barry about the problem, even though he was not one of the OA personnel with whom they supposedly had been authorized to discuss the Mail2 matter. (Aug. 3 Tr. 86; Aug. 1 Tr. 219-21.)

To reassure the NG employees that they would not become targets of retaliation for talking about the Mail2 problem, Gallant removed Crabtree from the project and encouraged the NG employees to meet with company counsel about their legal rights.  (Aug. 3 Tr. 222-23.)  Had Lindsay or other senior EOP officials intended to enforce the silence of the NG employees with threats, it does not stand to reason that they would have allowed a mid-level technical supervisor such as Gallant (then the Director of IS&T) to frustrate their intentions in this manner.  If nothing else, the testimony by Gallant and others demonstrates that any threats to NG employees with the loss of their jobs, or possibly jail, for disclosing the Mail2 problem were too short-lived to have had an impact on the course of this case.

At the same time, plaintiffs' speculation that Silbert informed the White House Counsel's Office about alleged threats made to NG employees as part of an effort to conceal the Mail2 problem was proven to be completely unfounded.  Silbert credibly testified unequivocally that he

---

[54] Lambuth had no first-hand knowledge to support her testimony that the threats allegedly conveyed by Crabtree originated with Lindsay.

recalled no such conversations with the Counsel's Office; that he was confident he would have remembered them if they had taken place; and that he was unaware of any allegations about threats at the time in question.  (Oct. 3 Tr. 54, 63, 65, 72-74, 80, 83; Dec. 20 Tr. 48, 49, 72-75.) Both Ruff and Lanny Breuer, the White House attorney to whom Silbert spoke, credibly testified similarly.  (Aug. 28 Tr. 72-73, 130; Oct. 19 Tr. 65, 68-71 (morning session).)  NG's in-house counsel testified that they had not heard about any discussions between Silbert and the White House Counsel's Office concerning threats to NG employees and knew nothing about the alleged threats themselves until the year 2000.  (Dec. 22 Tr. 29-30, 62-65, 86-89, 151-53, 162-63, 166, 169, 175-76, 208.)

There is, moreover, no evidence that the alleged threats were intended to prevent the disclosure of relevant information in this case, an essential prerequisite to any exercise of the Court's inherent power under these circumstances.  Nor is there evidence that threats were made in deliberate disregard of their recognized impact on the progress of this case, as is necessary for the imposition of sanctions.  *See Wallace*, 964 F.2d at 1219-20.

Plaintiffs elicited testimony from a variety of witnesses that persons with knowledge of the Mail2 problem, including Lindsay and Crabtree, were concerned that EOP may not, as a result, have been in full compliance with subpoenas issued by law enforcement authorities or congressional committees.  (Aug. 2 Tr. 63-64; Aug. 3 Tr. 52, 55-56, 80-81, 83.)  But none of the testimony shows that the purpose of the alleged threats was to impede the disclosure of relevant evidence to the plaintiffs in this case, or even that threats were made for the purpose of concealing the Mail2 matter in deliberate disregard of a recognized obligation to make it known to this Court.

To the contrary, although Lindsay was aware of the present case generally, he had no familiarity with the document discovery in this case, nor any idea whether e-mails had been requested or produced.  (Aug. 23 Tr. 193.)  And there is no evidence to connect the alleged threats by Crabtree with any effort to impede discovery in this case.  Moreover, as discussed above, plaintiffs have introduced no evidence that the e-mails affected by the Mail2 problem included messages having anything to do with this case, or even if they did, that anyone in a position of authority at the White House was aware of it.  Thus, plaintiffs have established no link between the alleged threats and an abuse of the Court's processes in this case, foreclosing the possibility of imposing sanctions based on their claims that threats were made.

## IV.    Other Possible Sanctions

Because plaintiffs have not pointed to any reasonably specific order of the Court which was violated by the filing of Daniel Barry's declarations or by Barry's deposition testimony, sanctions under Federal Rule of Civil Procedure 37(b)(2) would be improper.

Federal Rule of Civil Procedure 16(f) authorizes sanctions for failure to obey pre-trial orders and failure to participate in pre-trial conferences, neither of which has anything to do with the events at issue.  Similarly, Federal Rule of Civil Procedure 11 does not apply to discovery-related papers.  For these reasons – as well as for the complete failure of proof discussed above – the Court finds that sanctions cannot be imposed under these theories.

## CONCLUSION

The White House decided to reconstruct the e-mail not captured by ARMS as a result of the Mail2 problem, and pursuant to Orders of this Court to which the White House did not object, conducted searches for specified individuals and terms.  Through a series of *ex parte*, *in*

*camera* inspections, the Court oversaw this process and is satisfied with this search.  Millions of e-mails that were erroneously not captured by ARMS were restored into a searchable format, and thousands of e-mails were individually examined pursuant to this Court's Orders.

For all of the forgoing reasons, plaintiffs' motions for orders to show cause and for other relief have been denied in a separate order of this Court.

Signed by United States District Judge Royce C. Lamberth, April 3, 2008.