# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA



Cara Leslie Alexander *et al.*,
  Plaintiffs,

v.

Federal Bureau of Investigation,
*et al.*,
  Defendants.

§
§
§
§
§
§
§
§
§
§
§

Civil Action 96-2123 (RCL)

Consolidated Cases

FILED

MAR – 9 2010

U.S. DISTRICT COURT

## <u>Memorandum Opinion</u>

In 1996 the Clinton White House informed Congress that towards the beginning of President Clinton's first term, it had mistakenly asked the Federal Bureau of Investigation for the summary background reports of over four hundred former employees of the Bush and Reagan administrations.  Some of the files requested were of high ranking political appointees; others were simply non-political, career employees.  While the White House maintained that the requests were made as a result of bureaucratic bungling, others thought that something was rotten in the District of Columbia.  In any case, it was clear that something had gone wrong.  A number of those whose files were requested decided to file suit against the White House, the FBI, and those White House officials they believed responsible for requesting the files alleging sundry violations of the Privacy Act and the common law.  The defendants' motion for summary judgment and the plaintiffs' cross-motion for summary judgment are now before the Court.  Also

before the Court is the Attorney General's certification regarding the individual defendants' scope of employment.

I.    Background

The Executive Office of the President ("EOP") was created during the administration of President Franklin Roosevelt to house the immediate advisors to the President. *See generally* Cong. Res. Serv., Harold C. Relyea, *The Executive Office of the President: A Historical Overview*, CRS Report No. 98-606 (Nov. 26, 2008). Although the components of the EOP have varied over time, the White House Office,[1] whose members assist the President with those tasks incidental to the office, has been a part of the EOP since its inception. *Id.* at 24. The White House Office has various subcomponents as well. Among these are the Office of the White House Counsel, the Office of Legislative Affairs, the Office of the Press Secretary, and the Office of the Staff Secretary. *See* Dkt. 372-33, Defendants' Statement of Material Facts, ¶ 2. The bureaucratic babushka doll does not stop there though. The Office of the Staff Secretary houses a subunit called the Office of Records Management ("ORM"), *id.* ¶ 3, and until a reorganization in 1996 the White House Counsel housed a subcomponent called the Office of Personnel Security ("OPS"), *id.* ¶ 4. ORM maintains the files of the White House Office and ensures compliance with the Presidential Records Act. *Id.* ¶ 3. OPS was tasked

---

[1]  The White House Office is also sometimes referred to as the Office of the President, which undoubtedly invites confusion with the Executive Office of the President. *See Meyer v. Bush*, 981 F.2d 1288, 1310 (D.C. Cir. 1993). Some of the cases the Court cites refer to the White House Office as the Office of the President, *see, e.g., Wilson v. Libby*, 535 F.3d 697, 708 (D.C. Cir. 2008), this Court will refer to it as the White House Office.

with ensuring that all persons working at the White House underwent the background checks required to determine whether they could be cleared for regular access to the White House. *Id.* ¶ 5.

All people who work at the White House are required to undergo FBI background checks to determine whether they can be granted access to the facility. *See* Exec. Order 10450; 3 C.F.R. § 946 (1953). OPS was tasked with initiating these background investigations for new employees. Defendants' Statement of Material Facts at ¶ 25. OPS was also tasked with ensuring that employees who spanned two different administrations had up-to-date background checks.

At the beginning of the Clinton administration, most of the employees who had worked in OPS under the Bush administration left the White House. *Id.* ¶ 23. However, one holdover, Nancy Gemmell, who had worked in OPS and its predecessor since 1981, remained. *Id.* Given her experience, she was frequently sought out for advice about OPS's operation. *Id.* ¶ 24. In the spring of 1993, Ms. Gemmell informed Craig Livingstone, the director of OPS, that the office needed to conduct the "Update Project." *Id.* ¶ 26. The purpose of the Update Project was to recreate the personnel security files of holdover employees, like Ms. Gemmell, who continued to require access to the White House. *Id.* ¶ 27. This involved obtaining copies of the most recent FBI background reports to determine whether the employee was due for a five-year reinvestigation and whether they were suitable for continued employment in the new administration. *Id.* ¶ 28.

OPS was unable to use files from the Bush administration because these had been submitted to the National Archives, as required by the Presidential Records Act. *See* 44 U.S.C. §§ 2201 et seq. To begin the Update Project, OPS first had to identify the holdover employees who required continued access to the White House. Defendants' Statement of Material Facts at ¶ 30. To identify these holdovers, OPS would normally use a list of active pass holders obtained from the Secret Service. *Id.*

To begin the project Ms. Gemmell requested a list of all active pass holders from the Secret Service. *Id.* ¶ 33. The list she received, however, included both active and inactive pass holders, without designating their status. *Id.* at ¶¶ 33–4.

After obtaining the list, OPS would request new copies of the pass holders' summary background reports from the FBI's Executive Agencies Dissemination Subunit ("EADS"). *Id.* ¶ 31, 82. Although these requests were made on form memoranda with the printed name of the White House Counsel Bernard Nussbaum, they were not actually reviewed by anyone in the Counsel's Office. *Id.* ¶¶ 31, 38. Ms. Gemmell made a number of these requests from the time she received the list until her retirement in August 1993. *Id.* ¶ 39. Upon retiring Ms. Gemmell transferred responsibility for the Update Project to Anthony Marceca, a Department of Defense employee, who had been temporarily detailed to OPS. *Id.* ¶¶ 41, 42, 44. From December 1993 until his detail ended on February 18, 1994, Mr. Marceca submitted some 400 requests for FBI background files, including those of the plaintiffs. *Id.* ¶ 52.

At the time that OPS requested these background files, the process for transferring files from the FBI to the White House was governed by procedures set forth in memoranda of understanding between the FBI and the White House. *Id.* ¶ 81. EADS had routinely responded to such requests from the White House since the Eisenhower administration. *Id.* ¶ 84. The procedures EADS followed were virtually unchanged for the thirty years before these requests were made. *Id.* For EADS to process a request from the White House it first had to be received through the proper channels. *Id.* ¶ 86. The request had to appear on the proper form, and the forms were delivered to the FBI from OPS by an FBI courier. *Id.* All of the requests for plaintiffs' previous reports were ordinary on their face and were routinely processed. *Id.* ¶ 89.

However, though the requests appeared to be normal, and indeed, many were, some were not. Eventually Mr. Marceca learned that OPS had received files for people who no longer worked at the White House when, after circulating memoranda to various Executive Office components indicating that certain "employees" were overdue for their five-year background, he was informed that those "employees" did not currently work at White House. *Id.* ¶¶ 60–63. Indeed, a great number had never even worked in the Clinton White House. It is out of these requests that the present suit arose.

II.     Summary Judgment Standard

A party is entitled to summary judgment if, after an adequate time for discovery has passed, it can demonstrate that no genuine issue of material fact exists and it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment may be entered against a party if it has failed to "make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  In order to rebut the motion for summary judgment, the nonmovant doesn't need to present evidence "in a form that would be admissible at trial . . . ."  *Id.* at 324.  However, the evidence must be capable of being converted into admissible evidence.  *Glenken v. Democratic Congressional Campaign Committee*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).  Otherwise, it "counts for nothing."  *Id.*

Additionally, summary judgment shall be granted unless the dispute about material facts is genuine, that is, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the moving party has met its burden, the nonmovant must do more than show that there is some "metaphysical doubt as to the material facts;" in other words, the dispute must be genuinely genuine.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 457 U.S. 574, 587 (1986).

III.  Discussion

A.  The Privacy Act Does Not Apply to the White House Office

Earlier in this case, this Court held that the Privacy Act applied to the Executive Office of the President ("EOP"). *Alexander v. FBI*, 971 F. Supp. 603, 606–607 (D.D.C. 1997) (Lamberth, J.).  Since that decision, however, a number of intervening cases have persuaded this Court that its interpretation—then a matter of first impression—was not the correct one.  Fortunately, however, this Court is free to revisit its earlier decision.

Rule 54(b) allows a court to modify any ruling that adjudicates fewer than all the claims or rights and liability of fewer than all the parties, which does not end the action as to any of the claims or parties at any time before the entry of final judgment.  FED. R. CIV. P. 54(b).  The denial of a motion to dismiss is just such an order.  *Lemmons v. Georgetown Univ. Hosp.*, 241 F.R.D. 15, 22 n.11 (D.D.C. 2007).

This Court has indicated in the past that reconsideration will be granted as justice requires.  *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005) (Lamberth, J.).   Whether justice requires granting such a motion, rests on a determination, within the Court's discretion, whether it is necessary given the relevant circumstances. *Id.*  Some of those considerations are: (1) whether the court patently misunderstood one of the parties; (2) whether the court made a decision beyond the adversarial issues presented; (3) whether the court failed to consider a controlling decision or information; and (4) whether an intervening change in controlling law (or even a significant change) has occurred. *In Defense of Animals v. Nat'l Institutes of Health*, 543 F. Supp. 2d 70, 75 (D.D.C. 2008).  In

this case, the Court feels that an intervening change in controlling law warrants reconsideration of its previous denial of the Executive Office of the President's motion to dismiss.

The Privacy Act borrows its definition of agency from the Freedom of Information Act (FOIA). 5 U.S.C. § 552a(a)(1) ("[T]he term 'agency' means agency as defined in section 552(e) of this title. . . ."); *see also Dong v. Smithsonian Institution*, 125 F.3d 877, 878 (D.C. Cir. 1997). In turn agency is defined by FOIA to include "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of Government (*including the Executive Office of the President*), or any independent regulatory agency. . . ." 5 U.S.C. § 552(f)(1)[2] (emphasis added).

Although both the White House Office of Personnel Security and the Office of Records Management are components of the Executive Office of the President, and it would thus seem that they are indeed subject to the Privacy Act, a number of courts have held to the contrary when considering Privacy Act suits against various White House Office components. *See, e.g.*, *Banks v. Lappin*, 539 F. Supp. 2d 228, 234 (D.D.C. 2008). This is because "[t]he President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President are not included within the term 'agency' under the FOIA." *Kissinger v.*

---

[2] In 1986, Section 552(e) was relabeled section 552(f), however, no conforming amendment has been made to the Privacy Act. *Dale v. Executive Office of the President*, 164 F. Supp. 2d 22, 25 n.2 (D.D.C. 2001) (Urbina, J.).

*Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980); *see also Nat'l Security Archive v. Archivist of the United States*, 909 F.2d 541, 545 (D.C. Cir. 1990) (holding that White House Counsel's Office is not an "agency" for purposes of FOIA). The Supreme Court reached the conclusion that FOIA did not apply to such entities based on the unambiguous legislative history of an amendment to the statute, which sought to codify *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971). *Kissinger*, 445 U.S. at 156 (citing H.R. Conf. Rep. No. 93-1380, p. 15 (1974)). In *Soucie* the D.C. Circuit indicated that a component of the Executive Office whose sole function was to "advise and assist the President" would not be an agency under FOIA or the Administrative Procedures Act. 448 F.2d at 152.

Since that time there has been piecemeal application of FOIA and the Privacy Act to various components of the Executive Office and the White House Office. FOIA (and by extension the Privacy Act) has been applied to Executive Office Components that have substantial authority independent of the President. *Citizens for Responsibility and Ethics in Wash. v. Office of Administration*, 566 F.3d 219, 222–23 (D.C. Cir. 2009). The Council on Environmental Quality, the Office of Management and Budget, and the Office of Science and Technology have all been declared agencies under FOIA. *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980); *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978); *Soucie*, 448 F.2d 1067, 1073–75. In contrast, the National Security Council, the White House Counsel's Office, the President's

Task Force on Regulatory Relief, and the Council of Economic Advisors have all been excluded from FOIA's definition of agency because they are either part of the President's immediate staff or have the sole function of advising and assisting the President. *Armstrong v. Executive Office of the President*, 90 F.3d 553, 557, 557–66 (D.C. Cir. 1996); *Meyer v. Bush*, 981 F.2d 1288, 1292–98 (D.C. Cir. 1990); *Nat'l Sec. Archive*, 909 F.2d at 545; *Rushforth v. Council of Economic Advisors*, 762 F.2d 1038, 1040–41 (D.C. Cir. 1990). Most recently, the Court of Appeals determined that the Office of Administration, another Executive Office component, was also not within FOIA's purview. *CREW*, 566 F.3d at 226.

Aside from this Court's June 12, 1997 decision, every court to have considered whether the White House Office is subject to the Privacy Act has found that it is not. This Court's earlier decision was premised on its belief that the different purposes of FOIA and the Privacy Act counseled against extending case law that had exempted EOP components from FOIA disclosure requirements in light of the statute's plain language. *Alexander*, 971 F. Supp. at 606. Still, at the time the Court noted that its decision involved a question of law "as to which there is substantial ground for difference of opinion," by certifying its decision for interlocutory appeal. *See* Order of August 12, 1997 [Dkt. 81]; *see also* 28 U.S.C. § 1292(b).

Subsequent case law now makes clear that this Court's prior interpretation of the Privacy Act in *Alexander* is no longer the correct one. The Court of Appeals made clear in *Dong v. Smithsonian* that the Privacy Act's definition of

"agency" is to be interpreted coextensively with the term as used in FOIA.  125

F.3d at 878–879.  More recently, the Court of Appeals has made explicit what

*Dong* implies.  And that is, that the Privacy Act exempts the White House Office

from its coverage.  *Wilson v. Libby*, 535 F.3d 697, 708 (D.C. Cir. 2008) ("It is true

that the Wilsons cannot obtain complete relief under the Privacy Act because the

Act exempts the Offices of the President and Vice President from its coverage").

Additionally, although not controlling precedent, all the district courts to

have examined the issue since this Court's decision in *Alexander* have likewise

concluded that the Privacy Act does not apply to the White House Office.  *Tripp v.*

*Executive Office of the President*, 200 F.R.D. 140, 146 (D.D.C. 2001) (Sullivan,

J.); *Jones v. Executive Office of the President*, 167 F. Supp. 2d 10, 19 (D.D.C.

2001) (Kollar-Kotelly, J.); *Flowers v. Executive Office of the President*, 142 F.

Supp. 2d 38, 43 (D.D.C. 2001) (Kennedy, J.); *Falwell v. Executive Office of the*

*President*, 113 F. Supp. 2d 967, 970 (W.D. Va. 2000) (Wilson, C.J.); *Barr v.*

*Executive Office of the President,* No. 99-1695, slip op. at 6 (D.D.C. Aug. 9 2000)

(Green, June, J.).

In light of the Court of Appeal's decisions in *Dong* and *Wilson* along with

the persuasive reasoning of the other district courts to have considered the

question, this Court too concludes that the Privacy Act does not apply to the White

House Office, and thus the Executive Office of the President is entitled to

judgment as a matter of law.  Accordingly the defendant Executive Office of the

President's motion for summary judgment shall be granted.

B.    The FBI is entitled to summary judgment as a matter of law.

In order to recover in this action under the Privacy Act, the plaintiffs must prove that the government's conduct, when considered in its context, was intentional and willful.  5 U.S.C. § 552a(g)(4); *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  This does not make the government liable for every affirmative or negligent act that technically violates the Privacy Act, "[i]nstead, the violation must be so 'patently egregious and unlawful that anyone undertaking the conduct should have known it 'unlawful.'"  *Laningham*, 813 F.2d at 1242 (quoting *Wisdom v. HUD*, 713 F.2d 422, 425 (8th Cir. 1983)).   Summary judgment cannot be avoided merely by presenting evidence that "the government handled a matter in a disjointed or confused manner, or that the government acted inadvertently to contravene the Act."  *Waters v. Thornburgh*, 888 F.2d 870, 875–76 *abrogated on other grounds by Doe v. Chao*, 540 U.S. 614 (2004).   Rather, summary judgment is proper where the agency presents evidence explaining its conduct and its grounds for believing its action to be lawful.  *See Laningham*, 813 F.2d at 1242.

i.    Disclosure

The plaintiffs claim that the FBI's disclosure of their background reports to the White House violated the Privacy Act.  Section 552a(b) prohibits disclosure of "any record contained in a system of records by any means of communication to any person, or to another agency" unless one of several exceptions is met.  One such exception is that an agency may release a record if it does so for a "routine

use." 5 U.S.C. § 552a(b)(3). A routine use is one whose purpose "is compatible with the purpose for which the record was collected." *Id.* § 552a(a)(7). Agencies are also required to publish notice of each routine use of the records in their record system. *Id.* § 552a(e)(4)(D).

There is no dispute that the FBI published a list of routine uses as required by the statute. *See* 58 Fed. Reg. 51846, 51870 (Oct. 5, 1993). The FBI's notice states that records may be disclosed to any

> Federal agency[3] where the purpose in making the disclosure is compatible with the law enforcement purpose for which it was collected, e.g., . . . to assist the recipient agency in making a determination concerning an individual's suitability employment and/or trustworthiness for employment and/or trustworthiness for access clearance purposes . . . .

*Id.*

It is undisputed that the record requests in this case were facially unremarkable. Defendant's Statement of Material Facts ¶ 89. Nor is it disputed that all the forms indicated that the people whose records were sought were under consideration for access. In this case, the records were disclosed by the FBI and the FBI's purpose in making the disclosure was indeed compatible with its published notice of routine use. *See U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 9 F.3d 138, 144 (D.C. Cir. 1993) (defining compatible). The disclosures

---

[3] Despite this Court's holding that the Privacy Act does not apply to the White House Office because it is not an agency under FOIA, the FBI has long considered the White House to be a federal agency for the purpose of its Privacy Act regulations. Where an agency's interpretation of its own regulations is consistent with the regulations themselves, the agency's interpretation is normally controlling. *Fed. Labor Relations Auth. v. Dep't of Treasury*, 884 F.2d 1446, 1454 (D.C. Cir. 1989). Because the Court finds that the FBI's interpretation of agency is not inconsistent with the regulation itself, the Court will defer to the FBI's interpretation.

were also compatible with the purpose for which the records were collected. *Id.* That is, the plaintiffs' records were disclosed to determine whether they were sufficiently trustworthy to be granted access to the White House, and it is undisputed that the records were disclosed to the White House for the stated purpose that the White House required them to make access determinations. Thus the FBI's disclosure of the records was for a routine use and they are entitled to summary judgment as a matter of law.

But even were this not the case, the FBI would still be entitled to summary judgment, because the plaintiffs have failed to adduce any evidence that the FBI willfully and intentionally violated the Privacy Act. They have deposed none of the FBI employees who were responsible for processing previous report requests, and thus have not gathered any evidence that the defendant FBI willfully and intentionally violated the Privacy Act by disclosing their summary background reports. Furthermore, on the evidence that has been presented by the FBI, and indeed that isn't disputed, namely that these facially ordinary requests submitted according to unchallenged procedures that had been in place for thirty years, it is hard to fathom that any reasonable jury could find for the plaintiffs. Moreover, this Circuit has said that when an agency discloses records pursuant to its unchallenged regulations, or in response to a request that it justifiably believed to be authorized—as was the case here—the disclosing agency can't have willfully violated the Privacy Act. *Albright v. United States*, 732 F.2d at 189 (citing with approval *Wisdom*, 713 F.2d at 424 *and Doe v. Gen. Servs. Admin.*, 544 F. Supp.

14

530, 541–42 (D.Md. 1982)).   As such, the defendant FBI is entitled to summary judgment on the plaintiffs' § 552a(b) claims on these grounds as well.

     ii.    Safeguards

Agencies subject to the Privacy Act must establish "appropriate administrative, technical, and physical safeguards" to ensure the security and confidentiality of the "private" information under their charge.   5 U.S.C. § 552a(e)(10).  It is undisputed that numerous administrative, technical, and physical safeguards were in place at the time these events occurred.  *See* Defendant's Statement of Material Facts ¶¶ 78, 79, 81, 86.  Nor is it disputed that the FBI has admitted that it "failed in a larger sense to institute sufficient protections to effectively safeguard the very real privacy interest that we, as custodians of so many people's files, are responsible for protecting."[4]  *See* Ex. 7 to Plaintiffs' Cross-Motion for Summary Judgment (hereinafter "The Shapiro Report").  Despite this statement, the FBI contends that the safeguards it had in place at the time were adequate as a matter of law.  *See* Defendant's Motion for Summary at 56–60.

In light of conflict between the post-incident statements made by the FBI and the declarations of their employees, it would seem as if there were a genuine issue of material fact about the adequacy of the agency's privacy safeguards that

---

[4] The Court notes that the FBI's statements in the Shapiro Report were made with the caveat that their inquiry did not attempt to provide definitive answers, which renders the report susceptible to reliability problems that make its admission under the hearsay exception in Rule 803(8)(c) uncertain. *See In re Korean Airlines Disaster*, 932 F.2d 1475, 1481–82 (D.C. Cir. 1991); *see also Alexander*, 971. F. Supp. at 607 (noting interim nature of the Shapiro Report).

would preclude entering summary judgment for the FBI. However, as this Circuit has explained, in order to recover in an action under the Privacy Act the plaintiff must demonstrate the defendant's violation of the act, was intentional and willful. 5 U.S.C. § 552a(g)(4); *Laningham*, 813 F.2d at 1242. This means that the government is not liable for every affirmative or negligent act that technically violates the Privacy Act. *Laningham*, 813 F.2d at 1242. "Instead, the violation must be so 'patently egregious and unlawful that anyone undertaking the conduct should have known it 'unlawful.'" *Id.* (quoting *Wisdom v. HUD*, 713 F.2d 422, 425 (8th Cir. 1983)). The plaintiff may also meet its burden by showing that the agency "'flagrantly disregarded' the rights guaranteed under the Privacy Act." *Id.* (quoting *Albright*, 732 F.2d at 189). But in any case, even if the Court were to assume that the FBI's safeguards were inadequate as a matter of law, in order to prevail on their claim the plaintiffs would still need to establish that the FBI's failure was willful and intentional. *See* 5 U.S.C. § 552a(g)(4). And it is on this point that the plaintiffs have failed to carry their burden, which entitles the FBI to summary judgment. *See Celotex*, 477 U.S. at 322.

Despite the Court's earlier admonition that reliance on the Shapiro Report would not be enough to sustain a motion for summary judgment, *see Alexander*, 971 F. Supp. at 607, the plaintiffs attempt to do just that. They have not deposed a single FBI employee, nor brought forward any other evidence that would establish that the FBI's safeguards were so woefully inadequate that anyone examining them would have known they violated the Privacy Act. *See Laningham*, 813 F.2d

at 1242. Instead the plaintiffs ask this Court to grant them summary judgment based on the acknowledgement in the Shapiro Report that what safeguards were in place failed to protect the privacy interests of the plaintiffs. If this Court were to do so, it would establish exactly the sort of liability for technical violation of the Privacy Act that Congress wished to avoid by imposing a requirement of willful and intentional violation. *Albright*, 732 F.2d at 189.

It is hard for this Court to imagine how regulations that had been in place for almost thirty years without incident would appear "patently egregious and unlawful" to anyone or how by implementing safeguards and regulations designed to comply with the Privacy Act, the FBI "flagrantly disregarded" the privacy interests of others.[5] But because the plaintiffs have failed to put forward any evidence that the FBI willfully and intentionally violated the Privacy Act, all the Court can do is imagine. Since proving that the FBI's violation of the Privacy Act was willful and intentional is an element the plaintiffs bear the burden of proving to prevail and they have failed to adduce any evidence that the FBI did so, the Court finds that the defendant FBI is entitled to summary judgment against the plaintiffs on their claims under 5 U.S.C. § 552a(e)(10).

---

[5] The plaintiffs frequently cite to the Shapiro Report statement that the disclosure of the plaintiffs' records was an "egregious violation[] of privacy." This statement, however, bears not on the adequacy of the defendant's safeguards, but rather on the result of the disclosure.

C.     Plaintiffs' Failure to Oppose the Defendants' Motion for Summary
Judgment

Local Civil Rule 7(b) requires that an opposition to a motion shall be filed within 11 days of the date of service or at such other time as directed by the Court. The local rule also clearly states that a party's failure to file an opposition may be treated as a concession of the motion.

In this Circuit, this rule has been applied to motions for summary judgment with little controversy. *See FDIC v. Bender*, 127 F.3d 58, 68 (D.C. Cir. 1997) ("Because Local Rule 108(h)[6] provides for an exception to the 11-day limit only upon leave from the court . . . and because Bender did not seek such an extension of time, it was not an abuse of discretion for the district court, pursuant to Local Rule 108(b), to treat the FDIC's motion for summary judgment as conceded."). Furthermore, Rule 56 itself requires a party to oppose a *proper* motion for summary judgment by setting out specific facts that show a genuine issue of material fact for trial. FED. R. CIV. P. 56(e)(2). If a party fails to respond showing genuine issues of material fact, summary judgment may be entered against it. *Id.* However, simply treating the motion as conceded and granting the motion for summary judgment, if a defendant has not made a proper showing, would create discord between the local rule and the Rules of Civil Procedure. *See Henry v. Gill Indus.*, 983 F.2d 943, 949–50 (9th Cir. 1993); *see also Hibernia Nat'l Bank v. Administración Central Sociedad Anónima*, 776 F.2d 1277, 1279 (5th Cir. 1985).

---

[6] Local Rule 108(h) has since been renumbered Local Rule 7(b).

But the Court must interpret the local rule to be consistent with the requirements of the Rules of Civil Procedure. *See* FED. R. CIV. P. 83(a)(1). This simply means that even where a summary judgment motion is unopposed, it is only properly granted when the movant has met its burden. *Henry*, 944 F.2d at 950; *see also Weisberg v. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980); *cf. Adickes v. S.H. Kress & Co.*, 394 U.S. 144, 160 (1970) ("Because respondent did not meet is initial burden of establishing the absence of [a genuine issue of material fact], petitioner here was not required to come forward with suitable opposing affidavits.").

Here, plaintiff Cate has failed to respond to the defendants' motion for summary judgment altogether and plaintiffs Alexander and Duggan have failed to respond to the defendant FBI's motion for summary judgment on their claims under 5 U.S.C. § 552a(b). In both cases the Court finds that the entry of summary judgment against the plaintiffs is appropriate, as the defendants have met their burden.

First, the applicability of the Privacy Act to the White House Office is a matter of law, which applies equally to Mr. Cate. Given that this Court has found that Privacy Act does not apply to the White House Office, the Executive Office of the President is entitled to summary judgment against Mr. Cate on those claims as well.

All of the plaintiffs in this case appear to have abandoned their claim that that the FBI willfully and intentionally disclosed their records in violation of

Privacy Act.  However, given the Court's holding that the records were disclosed pursuant to a routine use, as well as the plaintiffs' failure to produce any evidence that the defendant willfully and intentionally disclosed their records in violation of the Privacy Act, the FBI is entitled summary judgment on the section 552a(b) claims against Mr. Cate and the other plaintiffs.

Finally, the FBI is also entitled to summary judgment against Mr. Cate on his claims that the FBI willfully and intentionally failed to institute safeguards sufficient to protect his records, as the plaintiffs have failed to put forward any evidence that the FBI willfully and intentionally violated section 552(e)(10) of the Privacy Act.

D.     Common Law Claims, the Individual Defendants' Scope of Employment, and the Federal Tort Claims Act

When this suit was originally filed, the plaintiffs also brought common law tort claims against the then White House Counsel, Bernard Nussbaum, as well as Craig Livingstone and Anthony Marceca.  Since then, all of the plaintiffs, with the exception of Joseph Cate, have voluntarily dismissed their claims for tortious invasion of privacy. *See* Dkt. 1447, 1449, 1451, 1453.  Thus the Court must still decide whether or not the substitution of the United States in place of the three named defendants is proper under the Westfall Act.

The Westfall Act grants federal employees immunity from common law tort claims that arise out of the acts taken in the scope of their employment.  28 U.S.C. § 2679(b)(1); *Osborn v. Haley*, 549 U.S. 336, 229 (2007).  If a government

employee is sued for a tort that was committed in the scope of his employment, the United States may substitute itself as the defendant upon the certification of the Attorney General.   28 U.S.C.  § 2679(d).   Litigation then proceeds under the Federal Tort Claims Act. *Osborn*, 549 U.S. at 230 (citing 60 Stat. 842).

The certification of the Attorney General is not conclusive, however, and is subject to judicial review. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995).   However, the certification of the Attorney General is treated as *prima facie* evidence that the employee was acting within the scope of his employment. *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994); *see also Council on American-Islamic Relations v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006).   If the plaintiff wishes to challenge the certification, he must, after an opportunity for reasonable discovery, come forward with competent evidence as to both scope of employment and the underlying merits, as if responding to a motion for summary judgment. *Kimbro*, 30 F.3d at 1509 (expressing approval of *Melo v. Hafer*, 13 F.3d 736, 747 (3d Cir. 1994)).   To determine whether the defendants were acting within the scope of their employment, the respondeat superior law of the state where the tort was alleged to have been committed is applied. *Wilson*, 535 F.3d at 711 (citing *Ballenger*, 444 F.3d at 663).

In this case, District of Columbia law, which follows the Restatement (Second) of Agency, applies. *Id.*   The Restatement provides that an employee's conduct falls within the scope of employment if it "is of the kind he is employed to perform; it occurs substantially within the authorized time and space limits; [and]

21

it is actuated, at least in part, by a purpose to serve the master." *Id.* (citing Restatement (Second) of Agency § 228(1)).

This Court previously rejected the government's argument that even if the individual defendants had gathered FBI files for partisan political purposes, it would be within the scope of their employment since they were political appointees. *Alexander*, 971 F. Supp. at 611. Here, despite voluminous discovery the plaintiffs have failed to bring forward any competent evidence that, first the defendants gathered the plaintiffs' files for partisan political purposes and further that the conduct that did occur was outside the scope of the individual defendants' employment. The Court addresses each individual defendant in turn.

      i.    Anthony Marceca

Although the plaintiffs dispute that Anthony Marceca relied on the June 10, 1993 list of pass holders obtained by Nancy Gemmell from the Secret Service in conducting the Update Project, despite nearly fourteen years of litigation in this case, they have failed to produce even a scintilla of competent evidence to the contrary. *Compare* Defendants' Statement of Material Facts ¶ 47 *with* Plaintiffs' Reply to Defendants' Statement of Material Facts ¶ 47. The "evidence" that they do point to, however, is neither reliable nor probative.

Plaintiffs rely extensively on an interim report from the House of Representatives Committee on Government Reform and Oversight, which assumed that Mr. Marceca must have used a "master list," that is one that distinguished between active and inactive pass holders. *See* House Report at 98.

22

Reports of investigations by governmental bodies made pursuant to law may be admitted as evidence under an exception to the hearsay rule unless "the circumstances indicate a lack of trustworthiness." FED. R. EVID. 803(8)(c); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 (1988). Here, the report itself noted that the Committee's investigation remained in progress and that it had yet to conclude "whether colossal incompetence or a sinister motive precipitated these events." House Report at 3. Given the self-professed interim nature of the report, *see In re Korean Airlines Disaster*, 932 F.2d 1475, 1481–82 (D.C. Cir. 1991), along with the production of part of the June 10, 1993 list, which undermines the report's assumption that Mr. Marceca relied on a "master list," the Court cannot find the interim House Report sufficiently trustworthy. Additionally, that conclusion is further contradicted by Mr. Marceca's own testimony before staff members of the House Committee, that he used a list provided by Ms. Gemmell. *See* Defendants' Motion [942], Ex. 34. Likewise Ms. Gemmell and Ms. Wetzl (who assumed responsibility for the Update Project after Mr. Marceca's detail ended), have testified that the list that they worked from did not distinguish between active and inactive pass holders. *See* Gemmell Decl. ¶¶ 16–21, Ex. A; Wetzl Dec. ¶¶ 20, 26, Ex. A. As such the Court rules that the interim House Report is inadmissible and cannot be the basis for concluding that Mr. Marceca was acting outside the scope of his employment. Still, even if the House Report were admissible, no reasonable jury could infer from it alone that Mr. Marceca requested the plaintiffs' summary background report for political purposes.

23

Indeed, beyond the one reference in the House Report, which the Court has already determined is *not evidence*, the plaintiffs have failed to produce any other competent evidence that Mr. Marceca requested the plaintiffs' summary background reports for political purposes. The plaintiffs also point to a statement made by Mari Anderson, another OPS employee, that they say is evidence that Mr. Marceca was acting outside the scope of his employment. Ms. Anderson's testimony before the Senate, however, indicates that while she and others in OPS were aware it received summary background reports for people who no longer needed access to the White House, they assumed that those people had worked in the Clinton White House at some point. Anderson Dep. 140:5–18. That the White House became aware it had requested summary background reports on people who *no longer* worked there is not evidence that those reports were requested for improper political purposes in the first place. And the plaintiffs have pointed to no evidence that they were.

Finally plaintiffs allege that Mr. Marceca used a list that included prominent Bush political appointees, whom OPS employees struck from the list using a permanent marker. As the government points out, however, this list could not have been the one Mr. Marceca worked from, because it does not include the information that the FBI required to process the summary background report requests from OPS. Additionally this second list doesn't contain the names of many of the former employees of the Bush and Reagan administrations whose background reports were requested by Mr. Marceca. The plaintiffs have presented

no evidence to the contrary, and this Court cannot rely on the mere conjecture of the plaintiffs alone.

Finally the plaintiffs ask this Court to draw an adverse inference from Mr. Marceca's invocation of his privilege against self-incrimination during his deposition in this case. While it is permissible to draw an adverse inference in a civil case from a witness's refusal to testify, in order to do so there must be "independent evidence to support the negative inferences . . . ." *United States v. Stelmokas*, 100 F.3d 302, 311 (3d Cir. 1996). Here since there is no independent evidence to support such a negative inference, the Court will not draw one.

Nothing else the plaintiffs cite provides evidence to support their allegations. As such, there can be no finding at Mr. Marceca was acting outside the scope of his employment under D.C. law. Furthermore, what evidence there is firmly supports the conclusion that Mr. Marceca was indeed acting within the scope of his employment when he requested plaintiffs' summary background reports. Accordingly, the Court will substitute the United States as a defendant in place of the defendant Anthony Marceca. 28 U.S.C. § 2679(d)(1).

    ii.    Craig Livingstone

There has been no evidence that Craig Livingstone sought to obtain the plaintiffs' FBI summary background reports for any improper purpose, political or otherwise. There is no dispute that Mr. Livingstone authorized the undertaking of the Update Project, at the insistence of Nancy Gemmell, but there has been no evidence that Mr. Livingstone had any involvement in the actual requisition of

summary background reports themselves and certainly not that he authorized the project to compile a political "hit list" for the Clinton administration. There is also no dispute that the Update Project was itself a necessary undertaking, and whatever steps Mr. Livingstone undertook to ensure that it began certainly fell within the scope of his employment, even if its execution was inadvertently flawed. As such, substitution of the United States as a defendant in place of Mr. Livingstone is proper under the Westfall Act. 28 U.S.C. § 2679(d)(1).

iii. Bernard Nussbaum

Under the Westfall Act an employee is held to have acted within the scope of his employment if he did not engage in the alleged conduct. *Kimbro*, 30 F.3d at 1506–08. The only reason that Mr. Nussbaum—as far as this Court can surmise—was named a defendant in this case is that his name appears on the forms that were used to request summary background reports. There has been no evidence that Mr. Nussbaum made these requests himself and as the Court has noted earlier, there has been no evidence presented that there was a conspiracy to request the plaintiffs' summary background reports for political purposes, let alone that Mr. Nussbaum was involved in it. As such, there can be no doubt that Mr. Nussbaum's conduct (or rather lack of conduct) places him under the protection of the Westfall Act. Accordingly, the United States shall be substituted as a defendant in place of Mr. Nussbaum. 28 U.S.C. § 2679(d)(1).

iv. Federal Tort Claims Act

Because the United States has been properly subsisted as a defendant for the three individually named defendants in this case, and the plaintiffs have failed to exhaust their administrative remedies under the Federal Tort Claims Act, this Court lacks jurisdiction over the claims in Count III of the Complaint. 28 U.S.C. § 2675(a); *McNeil v. United States*, 508 U.S. 106, 110–13 (1993). As such, Count III of the Complaint shall be dismissed. 28 U.S.C. § 2675(a).

IV. Conclusion

After years of litigation, endless depositions, the fictionalized portrayal of this lawsuit and its litigants on television, and innumerable histrionics, this Court is left to conclude that with this lawsuit, to quote Gertrude Stein, "there's no there there." While this Court seriously entertained the plaintiffs' allegations that their privacy had been violated—and indeed it was, even if not in the sense contemplated by Privacy Act—after ample opportunity, they have not produced any evidence of the far-reaching conspiracy that sought to use intimate details from FBI files for political assassinations that they alleged. The only thing that they have demonstrated is that this unfortunate episode—about which they do have cause to complain—was exactly what the defendants claimed: nothing more than a bureaucratic snafu.

As such, the government's motion for summary judgment shall be granted in a separate order to be issued today and the plaintiffs' cross-motion for summary judgment shall be denied. Additionally, the United States shall be substituted for the three individually named defendants—Anthony Marceca, Craig Livingstone,

and Bernard Nussbaum—and plaintiff Joseph Cate's claims against them shall be dismissed for his failure to exhaust administrative remedies as required by the Federal Tort Claims Act.

March 9th, 2010.

ROYCE C. LAMBERTH
Chief Judge
United States District Court